OPINION
On January 6, 1999, defendant, Delores Guinn, was indicted by the Franklin County Grand Jury on one count of possession of a controlled substance, crack cocaine, in an amount exceeding one gram but not exceeding five grams, a violation of R.C. 2925.01. On March 2, 1999, defendant filed a motion to suppress, arguing that the cocaine was seized in violation of her constitutional rights.
A hearing on defendant's motion to suppress was held on April 21, 1999. Columbus Police Officer Patrick Brooks testified that he has been a police officer with the city of Columbus for approximately three years, during which time he has made "hundreds" of narcotics arrests. On November 8, 1998, Brooks and his partner, Officer Douglas Jones, were on routine patrol during third shift (11 p.m. to 7 a.m.) when they drove by a two-story, twelve-unit apartment building located at 577 Miller Avenue. Brooks testified that the apartment building has "a long history for narcotics-related activity," and is a location that officers routinely check for stolen vehicles. (Tr. 6.) Brooks testified that he has made numerous arrests at the apartment building for a wide variety of offenses, including stolen vehicles, narcotics, weapons, domestic violence, and prostitution. According to Brooks, the police constantly receive complaints about narcotics activity in and around the building and conduct surveillance at that location at least once a week. During these surveillance operations, Brooks often notices people knocking on the front door of the building and, when there is no response, yelling up to the upstairs windows to be let in. Brooks testified that an undercover narcotics officer had made a narcotics buy in the apartment building just one week prior to the incident in question.
As Officers Brooks and Jones drove past the apartment building during the early morning hours of November 8, 1998, Brooks noticed three people standing on the front porch. Although he recognized defendant as "Delores," a woman he knew from prior narcotics-related arrests of several of her family members, he did not know whether or not she lived in the building. He did not know either of the other two individuals.
When Brooks first noticed the trio, defendant was "pounding on the door and yelling for someone to let her in." (Tr. 8.) According to Brooks, he pulled the cruiser over to a grassy area in front of the building "to conduct just an investigative stop." (Tr. 8.) When the officers pulled up in the cruiser, defendant became more "frantic," pounding on the door and yelling "Open the door. Open the door. Somebody open the door." (Tr. 9.) The other two individuals were just standing around. Jones approached the two individuals, while Brooks approached defendant. Brooks asked defendant, "What are you doing?" and "Do you have any identification on you?" (Tr. 9.) Defendant did not acknowledge Brooks. Rather, "she started walking around in circles again yelling for somebody to open the door [a]nd also she thrust her hand into her pocket." (Tr. 9.) According to Brooks, defendant was acting "very, very agitated, very excited, very out of normal behavior." (Tr. 10.)
Brooks testified that defendant's action in putting her hand into the pocket of her coat alarmed him. Fearing that defendant might have a weapon, Brooks repeatedly asked her to remove her hand from her pocket. According to Brooks, defendant "continued to keep her hands in her pockets * * * [and] started to turn that pocket away from me." (Tr. 11.) Believing defendant's actions to indicate that she had a weapon, Brooks used both of his hands to grab her wrist in an effort to pull her hand out of her pocket. Defendant struggled with Brooks, and the two eventually fell to the ground. Brooks called for assistance from Jones, who joined the struggle after radioing for backup.
When Brooks finally succeeded in removing defendant's hand from her pocket, he saw that her hand was clasped tightly around a "baggie," portions of which were sticking out between her fingers. Brooks pried defendant's fingers open and discovered that the baggie contained a white substance, which was later identified as crack cocaine.
When asked on cross-examination why he initially asked defendant for identification, Brooks stated that "it was just an investigative stop" to find out who was yelling and pounding on the door. Brooks denied that defendant told him that she lived in the building.
On re-direct, Brooks testified that he feared that defendant had a weapon in her pocket because at one point she took up a stance "just like you would draw a weapon" and refused to remove her hand from her pocket despite his repeated requests that she do so. To that end, Brooks testified, "I mean, I thought, what other reason would you have your hand in your pocket if you didn't hold on to a weapon." (Tr. 19.)
Officer Jones also testified on behalf of the state. Jones testified that he has been a police officer with the city of Columbus for approximately two and one-half years. During that time, he has conducted surveillance on the Miller Avenue apartment building and has made several narcotics and weapons arrests there.
Jones testified that he suspected some kind of criminal activity when he saw three people trying to enter the building, as it is "known for narcotics activity." (Tr. 23.) Jones testified that when he exited the cruiser and approached the threesome, he saw defendant pounding on the door and heard her yelling up to the second floor, "Let me in. Let me in." (Tr. 23.) According to Jones, the other two individuals began inching away from defendant, as if trying to separate themselves from her. Jones asked the two for identification and requested that they accompany him to the police cruiser so that Jones could speak to them. Both complied with his requests. As Jones was preparing to run warrant checks, he heard Brooks call for assistance. He then placed the two individuals in the cruiser and went to assist Brooks.
Jones ran over to where Brooks and defendant were struggling on the ground. Jones saw that defendant had her hand in her pocket and that Brooks had both of his hands on her arm. Jones helped Brooks remove defendant's hand from her pocket. He observed a white substance protruding between the fingers of her closed fist. Jones eventually released the two individuals he had taken to the cruiser.
On cross-examination, Jones denied that defendant told the officers that she lived in the apartment building. Jones further testified that he had seen defendant enter the building on previous occasions; however, he assumed that she did not live in the building, given the fact that she had to knock on the door to gain entrance.
The defense called three witnesses. Phyllis Kendrix, a resident of the building, testified that she went to the front door of the building to inform the officers of defendant's identity and of the fact that she (defendant) resided in the building; however, Brooks told her to go back inside the building. Brooks then closed the door and would not let defendant enter the building. Benny Kendrix, the husband of Phyllis Kendrix, testified that he saw the officers trying to pry open defendant's hand. Mr. Kendrix further testified that he had seen Brooks at defendant's apartment on at least one occasion prior to the incident on November 8, 1998.
Defendant testified that she resides at 577 Miller Avenue, Apartment 3-A. Regarding the events of November 8, 1998, defendant testified that she was outside the building yelling up to the second floor for her niece to let her in because she had lost her key. When Brooks approached her, she told him she was going into her apartment and asked him why he was bothering her. She told him that she did not have to talk to him. She further testified that her niece opened the front door to let her in; however, Brooks would not let her enter the building. She further stated that when Mrs. Kendrix came to the door and told Brooks that defendant lived in the building, Brooks told Mrs. Kendrix to go back inside and then pushed the door closed. She further testified that Brooks was aware that she lived in the building because he had been there to talk to her on prior occasions.
On cross-examination, defendant testified that she did not provide identification upon Brooks' request because she does not carry identification. She further testified that she acknowledged Brooks' request for identification by responding that she lived in the building. She denied that there were two other people on the porch with her, or that she pounded on the door, walked around in circles, or otherwise did anything abnormal. She testified that Brooks did not ask her to remove her hands from her pockets; rather, he asked her what was in her pockets. When she told him her pockets were empty, he tried to grab her hand and eventually pulled her to the ground.
After hearing arguments from counsel, the court requested that counsel provide the court with additional research regarding Brooks' request for identification:
 * * * [W]hat I would like you all to do is do a little research on the asking of identification. I don't believe the officers had sufficient information to believe criminal activity had already taken place or was taking place but that activity of drug nature does take place inside those premises and the people might be armed with drugs. And just believing that people are in a particular area that might be armed with drugs is not a sufficient reason to stop.
 But what I'd like you to find out is whether asking for ID, walking up to somebody, have some suspicions that might in the future be engaged in activity where you can ask for identification. [Tr. 53.]
Both the state and defense counsel complied with the trial court's request, filing supplemental memoranda on April 29, 1999, and May 3, 1999, respectively.
By decision filed May 27, 1999, the trial court granted defendant's motion to suppress. Factually, the court found that Brooks and Jones observed defendant and two other individuals seeking entrance to an apartment building known to the police for narcotics-related activity. The court further found that upon noticing defendant knocking on the door of her own apartment building, Brooks approached her and asked her for identification. The court quoted Brooks' testimony, wherein he stated that he recognized defendant as "Delores"; that he was uncertain whether she lived in the building; that he pulled over to conduct an investigatory stop when he saw the three individuals standing in front of the building; that defendant was pounding on the door and yelling for someone to let her into her apartment; and that he asked her for identification. The court further found that after defendant moved strangely around the area and put her hand in her coat pocket, Brooks, fearing for his own safety, wrestled defendant to the ground. Eventually, Brooks saw a baggie containing crack cocaine in defendant's hand; however, no weapons were either seen or found.
Based upon these facts, the court concluded as follows:
 It appears that this investigation took place without a reasonable suspicion that this Defendant was engaging, or was about to engage, in specific criminal conduct.
 The officer had a hunch that the Defendant and her friends were looking for drugs, but nothing more than a hunch. Being in an area where there is a lot of drug activity is not sufficient to justify an investigative stop. (See State v. Carter, (1994), 69 Ohio St.3d 57 and State v. Walker (1999) 98Ap 571).
 The State agrees that even though the stop can not be justified as based upon a reasonable articulable suspicion of criminal activity, the actions of the police officer can be justified as consensual.
 There is nothing consensual about this stop and/or subsequent request for identification. It is clear the Defendant wanted nothing to do with the officers. The officer didn't ask if he could talk to the Defendant, or anyone else. He didn't ask her if she minded giving some identification; his words were, "what are you doing . . . do you have any identification on you?" [Transcript p. 6].
 The stop and demand for identification were not consensual and the subsequent obtaining of the crack cocaine amounted to an unlawful seizure. The Motion to Suppress is sustained. (See Brown v. Texas (1979), 443 U.S. 47).
The State of Ohio has timely appealed the judgment of the trial court and asserts a single assignment of error: "The trial court erred when it granted the motion to suppress."
It is well-settled that, at a suppression hearing, evaluation of the evidence and credibility of witnesses are issues for the trier of fact. State v. Mills (1992), 62 Ohio St.3d 357,366, citing State v. Fanning (1982), 1 Ohio St.3d 19, 20. Appellate courts are bound to accept a trial court's findings of fact if they are supported by competent, credible evidence. Statev. Klein (1991), 73 Ohio App.3d 486, 488. Accepting those facts as true, an appellate court must independently determine, as a matter of law, without deference to the trial court's conclusion, whether the facts meet the applicable legal standard. Id.
The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fourth Amendment is applicable to the states by way of the Fourteenth Amendment. Mapp v. Ohio (1961),367 U.S. 643, 81 S.Ct. 1684. Searches and seizures conducted outside of the judicial process, without a warrant based on probable cause, are per se unreasonable, unless they come within one of a few well-established exceptions. Schneckloth v. Bustamonte (1973),412 U.S. 218, 219, 93 S.Ct. 2041, 2042. If evidence is obtained via actions that violate a person's Fourth Amendment rights, exclusion of the evidence is mandated. Mapp, supra.
It is well-established that not every encounter between a citizen and the police implicates the state and federal prohibition on unreasonable searches and seizures. Californiav. Hodari D. (1991), 499 U.S. 621, 625, 111 S.Ct. 1547, 1549;State v. Retherford (1994), 93 Ohio App.3d 586, 594. The Supreme Court of the United States has identified three categories of police-citizen contact to identify the separate situations where the guarantees of the Fourth Amendment are implicated. Floridav. Royer (1982), 460 U.S. 491, 103 S.Ct. 1319.
The first category is a consensual encounter. A police officer may lawfully initiate a consensual encounter without probable cause or a reasonable, articulable suspicion that an individual is currently engaged in criminal activity or is about to engage in such conduct. United States v. Mendenhall (1980),446 U.S. 544, 556, 100 S.Ct. 1870, 1878. A consensual encounter occurs when a police officer approaches a person in a public place, engages the person in conversation or requests information, and the person remains free not to answer and walk away. Id. at 553, 1876. An officer's request to examine a person's identification does not make an encounter nonconsensual, nor does the officer's neglect to inform the person that he is free to walk away. Florida v. Bostick (1991), 501 U.S. 429, 111 S.Ct. 2382. The Fourth Amendment guarantees are not implicated in such an encounter unless the officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. Mendenhall, supra at 554. 1877. Once a person's liberty has been restrained, the encounter loses its consensual nature and falls into one of the next two categories.
The second type of encounter is an investigatory stop. An investigatory stop is more intrusive than a consensual encounter, but less intrusive than a formal custodial arrest. An investigatory stop is limited in duration and purpose and may last only as long as it takes the officer to confirm or to dispel his suspicions that an individual is, or is about to be, engaged in criminal activity. Terry v. Ohio (1968), 392 U.S. 1, 16,88 S.Ct. 1868, 1877. An investigatory stop constitutes a "seizure" for purposes of the Fourth Amendment. Id.; State v. Seals (Dec. 30, 1999), Lake App. No. 98-L-206, unreported. A person is "seized" under this category when, in view of the totality of the circumstances surrounding the incident, by means of physical force or show of authority a reasonable person would have believed that he was not free to leave. Mendenhall, supra, at 553, 1876; Terry,supra, at 19, 1879. Factors suggesting that a person has been "seized" include: a threatening presence of several officers; the display of a weapon by an officer; some physical touching of the person; the use of language or tone of voice indicating that compliance with the officer's request might be compelled; approaching the person in a nonpublic place; and blocking the person's path. Mendenhall, at 554, 1877.
An officer may perform an investigatory stop without violating the Fourth Amendment as long as the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, supra, at 21, 1880. Reasonable suspicion has been described by courts as requiring more than an inchoate suspicion or a "hunch," but less than the heightened level of certainty required for probable cause. State v. Shepherd (1997),122 Ohio App.3d 358, 364. "A hunch is not an accepted basis for an intrusion on protected rights." State v. Rucker (1990),63 Ohio App.3d 762, 764. "An officer's belief that someone is `up to something' or that their actions are `not normal' does not necessarily justify a reasonable suspicion that criminal activity is afoot." State v. Lynch (June 5, 1998), Montgomery App. No. 17028, unreported.
In the absence of a bright-line test for determining the reasonableness of an investigatory stop, the Ohio Supreme Court has mandated that "[t]he propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." State v. Bobo (1988), 37 Ohio St.3d 177, paragraph one of the syllabus. Moreover, the circumstances must be viewed through the eyes of the reasonable and prudent police officer at the scene, who must react to events as they unfold. State v. Freeman (1980), 64 Ohio St.2d 291, 295. A court reviewing an officer's actions must give due weight to the officer's training and experience and must view the evidence as it would be understood by those in law enforcement. State v. Andrews
(1991), 57 Ohio St.3d 86, 88.
The third category of police-citizen contact is the formal custodial arrest. In Ohio, an arrest occurs under the following circumstances: (1) there was an intent to arrest; (2) under real or pretended authority; (3) accompanied by an actual or constructive detention; and (4) which is so understood by the person arrested. State v. Darrah (1980), 64 Ohio St.2d 22, 26. An arrest is obviously a seizure for Fourth Amendment purposes. The standard for effectuating a valid arrest is probable cause to believe that the person arrested has committed a criminal offense.
With these parameters in mind, we now turn to the instant case. The state contends that the trial court erred in granting defendant's motion to suppress. Specifically, the state argues that Brooks' initial contact with defendant was not a violation of the Fourth Amendment because the encounter was consensual, with Brooks merely approaching defendant, asking her a question, and requesting that she produce identification. The state further argues that even if Brooks' actions constituted a seizure of defendant, such action was supported by a reasonable suspicion that defendant was engaged, or about to be engaged, in drug activity. We agree only with the state's first position.
A close reading of the decision convinces this court that the trial court improperly concluded that Brooks' initial approach of defendant and request for identification constituted a seizure which was required to be supported by a reasonable and articulable suspicion of criminal activity. The trial court found that there was "nothing consensual" about the initial encounter between Brooks and defendant and that the subsequent request for identification rested solely on the contention that the request for identification was really a "demand" for identification. The trial court noted that Brooks "didn't ask if he could talk to the Defendant * * *" and "[h]e didn't ask her if she minded giving some information." As noted previously, a police officer may lawfully approach a person in a public place, request information from the person, and request to examine the person's identification without a reasonable and articulable suspicion that the individual is currently engaged in criminal activity or is about to engage in such conduct. As long as a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter, no Fourth Amendment guarantees are implicated.
In State v. Daniel (1992), 81 Ohio App.3d 325, a police officer approached the defendant and "asked him to show some identification." Id. at 327. The trial court found that the request constituted a seizure, but the appellate court reversed. Much like the present case, the officer in Daniel had "merely asked Daniel a few questions and asked him to produce identification. [The officer] did not use any words or actions to compel Daniel to comply with his requests." Id. at 328. TheDaniel court concluded that "[a] reasonable person would have interpreted [the officer's] questions as requests, not orders," and held that "Daniel had not been seized at that point." Id.
Similarly, in State v. Pierce (1998), 125 Ohio App.3d 592, this court found an encounter consensual when the police officer involved merely approached the defendant, asked him general questions such as "if everything's all right?" and "what was going on?" and asked if he had any identification with him.
Under the facts of the instant case, a reasonable person would have viewed Brooks' initial inquiries as requests, not demands, and would have felt free to leave. Indeed, Brooks testified that he initially approached defendant and asked her for identification just to find out who was yelling and pounding on the door of the building. No evidence suggests that during this initial encounter, Brooks used any words or actions to compel defendant to comply with his requests. Moreover, no evidence suggests that at the time Brooks made the initial inquiries, defendant was not free to leave or that she was restrained of her liberty in any way. Indeed, Brooks testified that defendant did not even acknowledge his questions. Further, defendant testified that upon Brooks' initial approach, she asked him why he was bothering her, and told him that she did not have to talk to him and that she was going into her apartment. Thus, it is apparent that defendant did not feel that compliance with Brooks' requests was compelled or that she did not believe that she was not free to leave. Accordingly, we agree with the state that Brooks' initial approach of defendant was a consensual encounter for which Brooks was not required to have a reasonable suspicion of criminal wrongdoing. Accordingly, the trial court's finding that defendant was seized upon the initial approach and request for identification by Brooks was not supported by competent, credible evidence.
A consensual encounter may ripen into a seizure, however, if, as noted previously, the officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to leave. While we agree with the state that Brooks' initial approach and request for identification constituted a consensual encounter, the subsequent blocking by Brooks of defendant's entrance into the building clearly constituted a show of authority and a restraint on defendant's liberty such that a reasonable person in defendant's position would not have felt free to leave.[1]Mendenhall, supra.
Having determined that Brooks' act of blocking defendant's entry into her apartment building constituted a seizure, we must next consider whether the facts available to Brooks at that time were sufficient to justify an investigatory stop of defendant.
The state sets forth several facts justifying Brooks' seizure of defendant: (1) the apartment building's reputation for having a very high volume of drug activity; (2) defendant's engaging in the same behavior (pounding on the door and yelling upstairs) known to Brooks as indicative of conducting a drug transaction; (3) the fact that the incident happened at night; (4) defendant's "frantic reaction to the approach of police" (engaging in louder door pounding and/or yelling and seeking entry into the apartment building); and (5) Brooks' knowledge of defendant's previous association with persons engaged in drug crimes.
Upon review of the totality of the circumstances involved in the instant case, we do not agree with the state's contentions that Brooks was justified in making the investigatory detention of defendant. On balance, we conclude that there was not a reasonable basis upon which Brooks could have believed that defendant intended to engage in criminal activity.
We arrive at this conclusion for several reasons. First, the Supreme Court of Ohio has expressed the view that an investigatory stop is not justified solely because the detention occurred in an area where there is a significant amount of drug activity. State v. Carter (1994), 69 Ohio St.3d 57, 65. Instead, the situs of a stop is simply one factor which may be considered in determining whether reasonable suspicion existed. As a result, Brooks' decision to stop defendant cannot be justified simply because the apartment building is situated in a high crime area or even because drug activity occurred in that very same building.
We also disagree with the state's contention that defendant's act of pounding on the door and yelling to the upstairs apartment provided Brooks with a reasonable and articulable suspicion that a drug transaction was imminent. Although drugs may well be sold to apartment "visitors" who engage in similar behavior as that of defendant, it is just as likely that defendant was engaged in an innocent activity (such as attempting to gain entrance to her own apartment building upon forgetting her key), as it is that she was engaged in an illegal one. See State v. McBride (Dec. 11, 1992), Lake App. No. 91-L-171, unreported ("Actions which are `also consistent with innocent behavior' are not sufficient to raise a reasonable suspicion that the defendant is engaged in criminal activities."). Indeed, both defendant and the Kendrixes testified that Brooks was told that defendant lived in the apartment building. Further, we find no merit in the state's contention that Brooks' knowledge that several of defendant's family members had been involved in narcotics-related activities constituted reasonable suspicion to believe that defendant was engaged in a drug transaction.
Brooks offered nothing else to indicate that drug activity was afoot at the time he seized defendant. Given the innocent nature of the above-noted factors, Brooks had, at best, an inarticulate hunch that defendant was engaged in drug activity and not a reasonable suspicion based upon his observations. As noted previously, a hunch is not an accepted basis for intruding upon a citizen's Fourth Amendment rights.
Having determined that the seizure of defendant was not justified by reasonable suspicion of criminal activity, any evidence obtained therefrom was inadmissible as fruit of an unconstitutional seizure. State v. McMillan (1993), 91 Ohio App.3d 1,5. Accordingly, the trial court did not err in granting defendant's motion to suppress the cocaine.
For the foregoing reasons, the sole assignment of error advanced by the State of Ohio is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
BROWN and McCORMAC, JJ., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] We note that the trial court did not address in its opinion the testimony of defendant and the Kendrixes regarding this issue. While this court generally would not act as a trier of fact on an appeal from a ruling on a motion to suppress, precedent does exist for an appellate court to consider an issue arising from a motion to suppress that was not addressed by the trial court when certain conditions are met. Those conditions include: no request from the parties in the trial court for findings of fact, State v.Amalick (1987), 41 Ohio App.3d 101, 104, and a record with sufficient evidence to demonstrate "that the trial court's decision was legally justified and supported by the record."State v. Brown (1992), 64 Ohio St.3d 476, 482. Because both conditions have been met in this case, we will consider defendant's argument that she was seized at the time Brooks prevented her from entering the door to her apartment building, even though the trial court did not reach that issue. See Statev. Baumgartner (June 11, 1999), Lucas App. No. L-98-1282, unreported.