[Cite as *State v. Carter*, 2020-Ohio-589.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 18AP-948 |
| v. | : | (C.P.C. No. 17CR-5405) |
| Armon D. Carter, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on February 20, 2020

**On brief:** *Ron  O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellant. **Argued:** *Seth L. Gilbert*

**On brief:** *John P. Rutan*, for appellee. **Argued:** *John P. Rutan.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Plaintiff-appellant, State of Ohio, appeals a judgment entered by the Franklin County Court of Common Pleas on December 4, 2018, suppressing the evidence against defendant-appellee, Armon D. Carter, because it was obtained as a result of an unconstitutional stop. Conducting a deferential review of the trial court's factual findings, we do not find that it clearly erred in determining that the officers blocked in Carter with their cruiser before developing reasonable suspicion sufficient to justify detaining him. We affirm the judgment of the trial court and overrule the State's sole assignment of error.

## I. FACTS AND PROCEDURAL POSTURE

{¶ 2} A Franklin County Grand Jury indicted Carter on October 4, 2017 for improper handling of firearms in a motor vehicle, carrying a concealed weapon, and a fifth-degree felony count for possession of less than five grams of cocaine with a firearm specification. (Oct. 4, 2017 Indictment at 1-2.) Carter pled "not guilty" and filed a motion

to suppress the evidence. (Oct. 18, 2017 Plea Form; May 4, 2018 Mot. to Suppress.) The State responded in opposition and the trial court held a hearing on the matter on August 14, 2018. (May 18, 2018 Memo. Contra; Hearing Tr., filed Jan. 22, 2019.)

{¶ 3} At the hearing, two officers of the Columbus Division of Police testified. Officer Nikolaos Velalis testified first. (Hearing Tr. at 6.) He testified that he was in uniform in a marked cruiser working with his partner, Officer Kevin Stewart, on March 23, 2017. *Id.* at 7. Stewart's testimony corroborated these basic facts. *Id.* at 62-63. At approximately 9:10 p.m. on that evening, he and Stewart patrolled Cooper Park in their vehicle. At that time of night and season of the year, Cooper Park is not well lit and is sometimes used for clandestine activities. *Id.* at 8. Exhibits and testimony introduced at the hearing showed that the parking lot for Cooper Park consists of a single north-south lane with parking spaces arrayed perpendicularly on both sides of the lane. *Id.* at 10-11; Court's Exs. 1-2. Though the lane continues to the north of the lot, the lane dead-ends some way further along at some soccer fields. (Hearing Tr. at 11.) Carter was parked nose-in, occupying the northwest-most parking space so that both the front and passenger sides of his car were bordered by curbs. *Id.* at 25-26, 65; Def. Ex. A.[1] The car's engine was turned off and not showing any lights or activity. (Hearing Tr. at 9.) Despite the fact that the car was legally situated and that Cooper Park did not close to the public until 11 p.m., Velalis testified that he found the automobile's presence suspicious. *Id.* at 9, 21-22.

{¶ 4} Velalis' and Stewart's testimony diverge when describing how they approached Carter's vehicle. Velalis testified that he ran the car's license plate through the cruiser's computer system when the cruiser was still 10 to 15 feet away. *Id.* at 10, 28. Then, after the computer notified him of a "possible warrant" for Carter (the registered owner of the car), he drove closer, stopping with the nose of his cruiser approximately 4 or 5 feet behind Carter's sedan. *Id.* at 10, 35-36. But Velalis admitted that he could not see Carter's license plate until he was behind the rear bumper of Carter's vehicle. *Id.* at 44-45. He also admitted that his written report indicated that he stepped out of his cruiser after he ran Carter's plate and does not say anything about driving closer first. *Id.* at 29. By contrast,

---

[1] Defense exhibit A is a compact disk containing multiple video files. The portions of the exhibit that show the position of Carter's automobile and the position of Velalis and Stewart's cruiser are located at file "011511_main.wmv" at 21:20:34-36, file "011512_main.wmv" at 21:20:26-30, and file "012933_main.wmv" at 21:28:33. Citations to defense exhibit A should be understood to refer to these portions of the exhibit.

Stewart testified that he and Velalis were in the cruiser approximately 5 or 6 feet behind Carter's vehicle when they ran the plate. *Id.* at 66-67. Stewart admitted, under questioning from the trial judge, that they were "pretty much upon" Carter's vehicle when they ran the plates. *Id.* at 73. Both officers testified that, notwithstanding the manner of their approach, they were not running lights or siren and Carter could have left because it was physically possible for Carter to have maneuvered his car out of the space. *Id.* at 11, 27, 73-74. Specifically, when asked if Carter was free to leave, Velalis testified, "He could have left. I wasn't going to chase him." *Id.* at 27. He later elaborated that Columbus Police Department policy would not have permitted a pursuit. *Id.* at 29.

{¶ 5} Carter had a different view about whether he was free to leave. Carter stated that the officers stopped the police SUV directly behind him and that he could not back up or go forward and did not feel free to leave. *Id.* at 50-51. He explained that the police cruiser was close to him and blocking the entrance to the only small path into which he could have reversed in order to turn his car around. *Id.* at 53.

{¶ 6} At the hearing, Carter's counsel clarified that Carter was only disputing the initial seizure. *Id.* at 17. However, for the sake of completeness, we note that after receiving notice of the "possible warrant" for Carter, and without first verifying if the warrant was valid, the officers approached with flashlights. *Id.* at 20-21, 76. Velalis noticed a gun holster retention clip on Carter's belt as he attempted to converse with Carter, who had locked himself in the car and refused to emerge. *Id.* at 15-18. After calling for and receiving backup, the officers broke Carter's car window and forcibly removed him and arrested him. *Id.* at 18. They ultimately recovered a gun from Carter's person and some amount of cocaine (massing less than five grams) from a search of the car. *Id.* Although Velalis testified at the hearing that the "possible" warrant was valid, in a recorded interview of the defendant, a Columbus Police Detective admitted that the warrant may not have been valid and that Madison County (which issued the "possible warrant") may have forgotten to remove the warrant notion from the Law Enforcement Automated Data System ("LEADS"). *Compare Id.* at 19, 21 *with* Defense Ex. B at 4:50-5:00, 6:30-7:00.

{¶ 7} After the close of evidence in the hearing, the trial court made a number of comments about the state of the evidence. In particular, the court noted that it found that Stewart was "more credible" in his testimony "with respect to running the plates and * * *

the angle of the vehicle and driving up." *Id.* at 79. The court also indicated it did not agree with the State's argument that the officers were not blocking Carter's egress. *Id.* at 88. Specifically, it said, "To me, viewing that [Defense Exhibit A] and being within five to ten feet, yeah, five feet is a lot of distance, but, given the layout there that I observed, I don't necessarily believe they parked in a manner which he could depart." *Id.* The court then recessed the hearing. *Id.* at 89.

{¶ 8} The parties reconvened for a ruling on December 4, 2018. At the outset, the trial court stated, in relevant part:

> THE COURT: Okay. Okay. Let me make a few statements here, and then I'm going to go ahead and issue a ruling.
>
> With respect to pulling up behind the vehicle - - and basically the officers blocked the vehicle in, I believe, based upon the testimony and just observing everything. They blocked the vehicle in, which there was testimony that if he wanted to leave he could have pulled around and went a different direction that would have been contrary to normal activities.
>
> This occurred at nine o'clock at night in a park. There were no restrictions on anyone being in the park at nine o'clock at night. The vehicle was legally parked. Other than pulling up on the vehicle and saying[,] ["]suspicious activity,["] there was nothing going on that would cause - - and this is based on the testimony - - that would cause a person to say, ["W]hat's going on here? Something's wrong here.["]

*Id.* at 93-94. After further arguments and discussion by the prosecution and the defense, the trial court indicated mixed conclusions on the issue, initially indicating an intention to deny the motion to suppress but then ultimately granting it. *Id.* at 94-104. Specifically, the trial court found:

> I'm going to reconsider what I said initially. I am going to suppress - - grant the Motion to Suppress. The officers in this case approached the vehicle that was legally parked in the park within the hours that the park was open. In approaching the vehicle, while they say there was room to back out, I think the manner in which they approached the vehicle did, in essence, block that vehicle. And, therefore, the Motion to Suppress is granted.

*Id.* at 104.

{¶ 9}   The same day, December 4, 2018, the trial court issued an entry to journalize its oral decision to grant the motion to suppress.  (Dec. 4, 2018 Entry.)   The State has appealed on the grounds that sustaining Carter's suppression motion rendered the State's "proof with respect to the pending charges so weak in its entirety that any reasonable possibility of effective prosecution has been destroyed."  (Dec. 11, 2018 Notice of Appeal at 1.) *See also* Crim.R. 12(K); R.C. 2945.67(A).

## II. ASSIGNMENT OF ERROR

{¶ 10}  The State submits a single assignment of error for review:

> The trial court committed reversible error in granting the motion to suppress.

## III.  DISCUSSION

{¶ 11}  In reviewing decisions made on motions to suppress, we afford deference to the trial court's factual determinations and review the trial court's recitation of historical facts for "clear error"; however, we review statements of law and their application to facts de novo.  *See, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, ¶ 50; *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶ 12}  "The United States Supreme Court recognizes three categories of police-citizen interactions: (1) a consensual encounter, which requires no objective justification, (2) a brief investigatory stop or detention, which must be supported by reasonable suspicion of criminal activity, and (3) a full-scale arrest, which must be supported by probable cause."  (Citations omitted.)  *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 13, citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Brown v. Illinois*, 422 U.S. 590 (1975); *Terry v. Ohio*, 392 U.S. 1 (1968).  Carter does not challenge the arrest and search that occurred after the officers became aware of the "possible warrant" and saw evidence that he was illegally carrying a pistol.  (Hearing Tr. at 17.)  Thus, this case involves only the distinction between the first and second types of encounters: consensual encounters, which require only the consent of the citizen, and investigatory stops, which require reasonable articulable suspicion of criminal activity.

{¶ 13}  We have previously discussed reasonable suspicion, explaining:

> "[A]n investigative stop does not violate the Fourth Amendment to the United States Constitution if the police have

reasonable suspicion that 'the person stopped is, or is about to be, engaged in criminal activity.' " *State v. Jordan*, 104 Ohio St.3d 21, 2004 Ohio 6085, P35, 817 N.E.2d 864, *quoting United States v. Cortez* (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L. Ed. 2d 621.

Reasonable suspicion entails some minimal level of objective justification, "that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones* (1990), 70 Ohio App.3d 554, 556-57, 591 N.E.2d 810, 8 Anderson's Ohio App. Cas. 48, *citing Terry*, 392 U.S. at 27, 88 S.Ct. at 1883; *State v. Carter*, 69 Ohio St.3d 57, 66, 1994 Ohio 343, 630 N.E.2d 355 (concluding a police "officer's inarticulate hunch will not provide a sufficient basis for an investigative stop"). Accordingly, "[a] police officer may not rely on good faith and inarticulate hunches to meet the *Terry* standard of reasonable suspicion." *Jones*[, 70 Ohio App.3d] at 557.

*Jones* at ¶ 16-17.

{¶ 14} Using this definition, it is clear that the police had a hunch rather than a reasonable suspicion about Carter's legally parked automobile. As the trial court articulated the issue:

This occurred at nine o'clock at night in a park. There were no restrictions on anyone being in the park at nine o'clock at night. The vehicle was legally parked. Other than pulling up on the vehicle and saying[,] ["]suspicious activity,["] there was nothing going on that would cause - - and this is based on the testimony - - that would cause a person to say, ["W]hat's going on here?["]

(Hearing Tr. at 94.) Given that the trial court did not err in finding that the police did not have probable cause or reasonable suspicion to stop or seize Carter before running the numbers on the license plate of his vehicle, the question is whether they did, in fact, seize him in the sense contemplated by the law.

{¶ 15} We have previously explained:

"[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred" within the meaning of the Fourth Amendment.

*Jones* at ¶ 11, quoting *Terry* at 19, citing *Brendlin v. California*, 551 U.S. 249, 254 (2007). Here, the trial court repeatedly found (and after reviewing the testimony and video evidence, we agree) that Carter was seized when the officers pulled up a few feet behind his car with the result that it was effectively blocked on three sides. (Hearing Tr. at 79, 88, 93-94, 104.) The State argues that the evidence before the trial court in fact showed that Carter could have backed out easily. (State's Brief at 10-12.) That argument is at odds with the trial testimony (at least those parts of it that the trial court determined were credible). (Hearing Tr. at 79, 88, 93-94, 104.) Further, though we agree that parts of the video could be interpreted to conclude that Carter could have managed to pull out without striking the squad car, the maneuver would not have been simple and would have required either driving over the curb or solid-line marked parking spaces because the police SUV was stopped on the wrong side of the parking lot lane and was behind Carter's sedan. (Defense Ex. A.)

{¶ 16} Moreover, the question of whether one is "free to leave" a police encounter is not whether a contortionist or skilled driver could have wormed his way to freedom without physically pushing an officer or bumping a squad car. The question is whether " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Brendlin* at 255, quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), citing *California v. Hodari D.*, 499 U.S. 621, 627 (1991); *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *Immigration and Naturalization Serv. v. Delgado*, 466 U.S. 210, 215 (1984). As applied to this case, then, the question so raised is what import would a reasonable person in Carter's position assign to Velalis' decision to pull his police SUV to the wrong side of the lane behind Carter's sedan and stop there? This is the inquiry the trial court indicated it was using when it stated that it was "thinking about human nature and what a person would think" about the positioning of the police SUV. (Hearing Tr. at 74.) Essentially, the trial court considered whether the police cruiser's blocking action fully or mostly cut off all physical possibility of escape and whether a reasonable person in that circumstance would interpret the positioning of the cruiser as a show of authority indicating that the officer did not want the person to leave? We agree with the trial court that the answer to these questions is that a reasonable person would not have felt free to leave.

{¶ 17} The State also argues, in the alternative, that even if the police engaged in a show of authority, Carter was not seized because he did not "submit" to the show of authority. (State's Brief at 17-20.) As evidence of this, the State points to the fact that Carter later had to be dragged from his car after the police broke the window. *Id.* at 18, 20. However, this simply shows that Carter did not willingly submit to the later arrest. The relevant seizure on appeal is the one that was effected when Velalis parked his police SUV in such a way so as to make it difficult for Carter to leave. It is true, as the State argues, that Carter did not overtly submit to that show of authority. *Id.* at 18. But the standard enunciated in *Brendlin* was developed for situations precisely such as this where the show of authority and submission to it are less than explicit. That is, *Brendlin* stated:

> When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not. The test was devised by Justice Stewart in [*Mendenhall*, 446 U.S. 544,] who wrote that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *id.*, at 554 * * * . Later on, the Court adopted Justice Stewart's touchstone, *see, e.g.,* [*Hodari D.*, 499 U.S. at 627; *Chesternut*, 486 U.S. at 573; *Delgado*, 466 U.S. at 215.]

*Brendlin* at 255. Since we (and the trial court) have already confirmed that a reasonable person in Carter's position would not have felt free to simply drive away, the fact that Carter did not drive away is all that is necessary to show that he submitted to the seizure. *See id.* at 262 ("[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.").

{¶ 18} The State's final argument is that even if Carter was seized illegally before the officers learned of the possible warrant, a valid warrant against Carter broke the causal chain between the illegal seizure and the search such that the evidence need not have been excluded. (State's Brief at 26-28, citing *Utah v. Strieff*, ___ U.S. ___, 136 S.Ct. 2056 (2016). The prototypical formulation of that exception was enunciated in the original "fruit of the poisonous tree" case, *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). *Wong Sun* held, "[w]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would

not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.,* quoting Maguire, *Evidence of Guilt*, 221 (1959). In several ways, we find this case does not meet the exception to *Wong Sun* used in *Strieff* and is distinguishable from *Strieff*.

{¶ 19} In *Strieff*, an officer observed the defendant exit a residence that had been identified by a tipster as a drug house. *Strieff* at 2059-60. The officer stopped the defendant, asked for his identification, ran a warrant check, and found that the defendant had a valid warrant for his arrest. *Id.* at 2060. When the officer arrested the defendant and searched him incident to the arrest, he discovered methamphetamine and paraphernalia. *Id.* The United States Supreme Court reasoned that even if the initial stop was not supported by reasonable suspicion (a point the prosecution conceded), the presence of a valid arrest warrant was an intervening constitutionally valid justification for the arrest and search such that those later intrusions could no longer be considered "poisoned fruit" of the tainted stop. *Id.* at 2064. In making that judgment, the Court employed a three-part test considering (1) the temporal proximity between the initially unlawful stop and the search, (2) the presence of intervening circumstances (the warrant), and (3) the officers' actions in detaining Carter without cause more obviously violated the Fourth Amendment. *Id.* at 2062-63. It found that the temporal proximity was very close (which militated in favor of exclusion). *Id.* at 2062. But it also found that the officer acted reasonably (if mistakenly) in detaining Strieff after he exited the suspected drug house and that the existence of a valid arrest warrant, wholly unconnected with the illegal stop, strongly favored an exception to exclusion. *Id.* at 2062-63.

{¶ 20} Here, as in *Strieff*, the arrest and search immediately followed the illegal seizure. Thus, that factor weighs strongly in favor of suppression. Unlike in *Strieff*, Carter had not just exited a suspected drug house or done anything at all suspicious. He was merely sitting in a car parked in a public lot after dark during hours the park was open. Thus, the stop here, conducted with little or no suspicion, was even less justified than the stop in *Strieff*. The officers' actions in detaining Carter without cause were commensurately violating the Fourth Amendment. Finally, the existence of a "valid" warrant that "strongly"

militated against suppression was the principal reason the *Strieff* court declined to suppress. *Id.* at 2062. Yet, in Carter's case, although Velalis testified that he thought the "possible warrant" eventually turned out to be good, video evidence was introduced of a detective interviewing Carter, essentially admitting that the "possible warrant" turned out to have been a mistake. *Compare Id.* at 19, 21 *with* Defense Ex. B at 4:50-5:00, 6:30-7:00.

{¶ 21} Carter was not visibly breaking any laws or doing anything objectively suspicious as he sat in his legally parked car at around 9 p.m. in a lot that did not close until 11 p.m. Velalis, based on a hunch, would have been within his rights to approach Carter to see if he wanted to engage in a consensual conversation. But, instead, Velalis detained Carter when he positioned his police SUV behind Carter's sedan in a way that would have communicated to a reasonable person that Carter was not free to leave. After that show of authority, Carter did not, in fact, attempt to leave. Then, receiving a notification that Carter was the subject of a "possible warrant," and without first verifying that it was a valid warrant, Velalis engaged with Carter, saw that he had a gun, broke the window of Carter's car, dragged him bodily from the vehicle, and arrested him. Velalis' actions, the arrest, and the search were all gained through "exploitation" of the "primary illegality," to wit, the illegal detention that prevented Carter from simply driving away. *Wong Sun* at 488. They are fruit of the poisonous tree and were properly suppressed by the trial court.

{¶ 22} The State's assignment of error is overruled.

## IV.  CONCLUSION

{¶ 23} We accord deference to the trial court's factual findings and do not find that it clearly erred in determining that the officers blocked Carter in with their cruiser before developing reasonable suspicion sufficient to justify detaining him. Everything that came after the illegal stop—the discovery of the possible (but not actual) warrant, plain view observation of the gun holster, breaking the window of Carter's car, forcibly arresting Carter, and the searching of his car—was accomplished by exploitation of the illegal stop which kept Carter present when he might otherwise have departed. The evidence obtained from the officers' actions was properly subject to suppression. We affirm the judgment of

the Franklin County Court of Common Pleas and overrule the State's sole assignment of error.

*Judgment affirmed.*

KLATT and DORRIAN, JJ., concur.

_____