[Cite as *State v. Walton*, 2020-Ohio-5062.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 19AP-258 |
| v. | : | (C.P.C. No. 18CR-3336) |
| Drake D. Walton, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on October 27, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard.*

**On brief:** *Yeura R. Venters*, Public Defender, and *Robert D. Essex*, for appellant. **Argued:** *Robert D. Essex.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Drake D. Walton, appeals from a judgment of the Franklin County Court of Common Pleas entered on March 26, 2019, imposing a two-year period of community control for the offense of carrying a concealed weapon. Walton challenges the denial of his motion to suppress in this appeal. We agree that the 911 tipster in this case was not anonymous, but she did not have personal knowledge when she informed police that a man in a maroon jogging suit standing near a blue Honda in the vicinity of 1034 South Kellner Avenue had a gun and was trying to harm her. Even if her call amounted to reasonable suspicion to stop such an individual, the police in this case detained two men and one woman, none of whom were wearing a maroon jogging suit, all of whom were clustered around a silver Honda (with a blue Honda also nearby). We reverse the trial court's decision on Walton's motion to suppress because, although the police arguably had reasonable suspicion to detain and frisk an individual who matched the

description given by the tipster, Walton did not match that description.  We find that the police did not have reasonable suspicion to stop and frisk Walton and that his conviction should be reversed.

## I.   FACTS AND PROCEDURAL HISTORY

{¶ 2}    On July 11, 2018, a Franklin County Grand Jury indicted Walton for carrying a concealed weapon.  (July 11, 2018 Indictment.)  Soon after pleading "not guilty," Walton filed a motion to suppress.  (July 25, 2018 Plea Form; Dec. 14, 2018 Mot. to Suppress.)  The trial court held a hearing on the motion in February 2019.  (Feb. 28, 2019 Hearing Tr., filed June 3, 2019.)

{¶ 3}    At the hearing, a single witness, Officer Nathan Anstine of the Columbus Division of  Police, testified.  *Id.* at 4.  He testified that on March 31, 2018, he and his partner, Jason Ellsesser, were dispatched to 1034 South Kellner Avenue.  *Id.* at 5.  The dispatch radio transmission was played at the hearing and introduced as an exhibit.  *Id.* at 6-7.  In relevant part, the dispatcher said, "Ten thirty-four South Kellner, male black, maroon jogging suit, supposedly has a 33[1] standing outside of a blue Honda."  *Id.*; *see also* State's Ex. B, 2018-03-31_18.10.41_Ch62.WAV.  The "PatrolView" log revealed that the caller to the police dispatcher had not seen the gun firsthand but that her daughter had.  (State's Ex. B1.)  The log also revealed the first name and phone number of the caller and alleged that the black fellow in the maroon jogging suit was "trying to harm the caller."  *Id.* Anstine confirmed that the dispatch constituted the entirety of the information he and his partner had when they approached the area of 1034 South Kellner Avenue.  (Hearing Tr. at 8.)

{¶ 4}    According to Anstine, he and Ellsesser encountered Walton approximately 40 or 50 yards from the steps of 1034 South Kellner Avenue.  *Id.*  Body camera videos from both Anstine and Ellsesser, introduced during the hearing as State's Exhibit C, show what occurred.  As the officers drove to the scene, Ellsesser said, "Blue Honda."  (State's Ex. C, Ellsesser Body Camera[2] at 1:11.)  Anstine responded, "Straight ahead.  See it?"  *Id.* at 1:18. As they got closer and could see people standing near a Honda, Ellsesser objected, "That's not any of our people, though.  No track suit."  *Id.* at 1:22-1:27.  Anstine responded, "That's

---

[1] The officer testified that a "33" is radio code for a firearm. (Hearing Tr. at 7.)
[2] Found in file JasonEllsesser_201803311812_VHC2013966_46867374.mp4.

a light blue Honda, though." (State's Ex. C, Anstine Body Camera[3] at 1:27-1:29.) Ellsesser then mused, "Maroon jogging suit. Where's a maroon jogging suit?" (State's Ex. C, Ellsesser Body Camera at 1:33-1:36.)

{¶ 5} Video shows that the police officers parked near two Hondas (one silver and one, parked several feet behind it, which was light blue). (State's Ex. C, Anstine Body Camera at 1:46-52.) Two black men were standing at the trunk of the silver car eating chicken wings from a container perched on the trunk lid. *Id.* One wore a red-hooded sweatshirt and jeans. *Id.* at 2:08-2:09. The other, Walton, wore a gray-hooded sweatshirt and jeans. *Id.* Immediately upon approaching the men, Anstine said, "What's up, guys? Were you guys in a dispute earlier? <Pointing toward houses behind the men.> With them?" *Id.* at 1:45-1:51. Walton gestured in the same direction and responded, "No, sir. No. I know them, we're fine." *Id.* at 1:48-1:53. After confirming that Walton lived in the area and owned the blue Honda, Anstine inquired, "Why did they say you have a gun?" *Id.* at 1:53-2:02. Walton asked, "Who?" *Id.* at 2:02. A number of voices then spoke at once but Anstine responded, loudly over the rest, that the police had received a call saying someone near a light blue Honda had a gun. *Id.* at 2:02-06. Walton denied it, saying, "No, sir. No. No, sir. No." *Id.* at 2:07-2:09. Anstine responded, "None of you guys?" *Id.* at 2:07-2:08. Then he began to move toward the men saying, "Alright. I'm just gonna check you real quick. Okay, just keep your hands up." *Id.* at 2:08-2:11.

{¶ 6} As Anstine approached, Walton slid both hands down the sides of his gray sweatshirt toward the center pocket. *Id.* at 2:09-11. Anstine reacted by repeating the command to Walton to keep his hands raised and berating him about how unintelligent it was for him to have reached for his pocket right as Anstine ordered him to keep his hands up and after Anstine had said he was going to check him for a gun. *Id.* at 2:10-2:31. As Walton stood with his hands raised, Ellsesser approached, held Walton's hands behind his back, and, withdrew a pistol from the front pocket of Walton's sweatshirt. *Id.* at 2:16-2:31; *see also* State's Ex. C, Ellsesser Body Camera at 2:16-2:32. Ultimately, the police handcuffed and detained Walton, the man in the red sweatshirt, and a black woman who had been seated in the Honda. (State's Ex. C, Ellsesser Body Camera at 2:16-5:07.)

---

[3] Found in file NathanAnstine_201803311812_VHC2013974_46656683.mp4.

{¶ 7}   Anstine's testimony during the hearing generally agreed with the body camera footage.  He agreed, for example, that neither Walton nor the other man had been wearing a maroon jogging suit.  (Hearing Tr. at 9, 37-38.)  He agreed that the tip was not for multiple persons near a blue Honda but rather just a single black male in a maroon jogging suit.  *Id.* at 45.  However, he stated that he stopped because there was a black male next to a blue Honda in the suspect area.  *Id.* at 41-42.  He confirmed that neither Walton nor the other man made furtive movements when he and the other officer initially approached—the two simply carried on eating chicken wings from the container on the back of the car.  *Id.* at 34.  Anstine also agreed that, when he asked Walton if he had a gun and made the decision to check him, he did not know if Walton had a gun.  *Id.* at 46.  He only noticed the heavily laden pocket of Walton's sweatshirt after he told Walton he was going to pat him down, approached in order to do so, and Walton appeared to make a move toward that pocket.  *Id.* at 30, 51-52.  Anstine admitted that, when he spoke to the 911 caller after arresting Walton, the caller asked why Walton had been arrested and indicated that the police had arrested the wrong person.  *Id.* at 49-50.

{¶ 8}   On March 5, 2019, the trial court issued a decision denying the motion to suppress.  (Mar. 5, 2019 Decision & Entry.)  The trial court's findings of fact are consistent with the above summary of the record.  *Id.* at 1-3.  In reaching its decision to deny the motion to suppress, the trial court reasoned that of the identifying pieces of information given by the dispatcher, Walton fit most of them, except the "maroon jogging suit" detail.  *Id.* at 5.  Under the circumstances, the trial court concluded that the officers had reasonable suspicion to stop and pat-down Walton.  The trial court also found that Walton's reaction, when Anstine expressed his intention to do that, gave the officers probable cause to search and find the gun.  *Id.* at 3, 5.

{¶ 9}   After the trial court denied suppression of the evidence—the gun the police found on his person when they searched him—Walton entered a plea of "no contest" to a single count of carrying a concealed weapon and was sentenced to two years of community control.  (Mar. 25, 2019 Plea Form; Mar. 26, 2019 Jgmt. Entry at 1.)  Walton now appeals.

## II. ASSIGNMENT OF ERROR

{¶ 10} Walton presents a single assignment of error for review:

> Appellant's right to be [free] from an unreasonable search and
> seizure under the United States and Ohio Constitutions was

violated when the trial court denied Defendant-Appellant's motion to suppress evidence where the anonymous tipster did not personally observe any criminal conduct, the appellant did not match the clothing description the tipster relayed, and the officers did not corroborate any evidence of illegal activity.

## III. DISCUSSION

{¶ 11} We acknowledge that a trial court's factual determinations on motions to suppress are afforded deference and, thus, we review a trial court's factual determinations on motions to suppress for "clear error." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). However, a trial court's statements of law and application of law to facts as determined by it, are subject to de novo review. *See, e.g., id.*; *In re A.J.S.,* 120 Ohio St.3d 185, 2008-Ohio-5307, ¶ 50; *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶ 12} "The United States Supreme Court recognizes three categories of police-citizen interactions: (1) a consensual encounter, which requires no objective justification, (2) a brief investigatory stop or detention, which must be supported by reasonable suspicion of criminal activity, and (3) a full-scale arrest, which must be supported by probable cause." (Citations omitted.) *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 13 (10th Dist.), citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Brown v. Illinois*, 422 U.S. 590 (1975); *Terry v. Ohio*, 392 U.S. 1 (1968). In this case, there appears to be little dispute that Walton was the subject of a "brief investigatory stop or detention," that began either when Anstine started questioning him about whether he had been involved in an altercation with his neighbors or, at a minimum, when he told Walton to put up his hands because he intended to "check" him for a weapon. *Jones. See, e.g.*, State's Brief at 14-16; Walton's Brief at 20-22. For the sake of argument, if Walton was validly detained for a pat-down, it is fair to say that Walton's reach for a heavy bulge in his pocket in response to the officer's demonstrated intent to frisk him for a gun, generated at least reasonable suspicion that he had a concealed weapon in possible violation of R.C. 2923.12(A)(2). The crucial question to this case is whether Anstine was objectively justified in reaching the second level of police-citizen interaction in detaining Walton and seeking to frisk his person under these circumstances.

{¶ 13} This Court has previously explained reasonable suspicion, generally, in the context of detention, with this language:

> "[A]n investigative stop does not violate the Fourth Amendment to the United States Constitution if the police have reasonable suspicion that 'the person stopped is, or is about to be, engaged in criminal activity.' " *State v. Jordan*, 104 Ohio St.3d 21, 2004 Ohio 6085, P35, 817 N.E.2d 864, quoting *United States v. Cortez* (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L. Ed. 2d 621.

> Reasonable suspicion entails some minimal level of objective justification, "that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones* (1990), 70 Ohio App.3d 554, 556-57, 591 N.E.2d 810, 8 Anderson's Ohio App. Cas. 48, *citing Terry*, 392 U.S. at 27, 88 S.Ct. at 1883; *State v. Carter*, 69 Ohio St.3d 57, 66, 1994 Ohio 343, 630 N.E.2d 355 (concluding a police "officer's inarticulate hunch will not provide a sufficient basis for an investigative stop"). Accordingly, "[a] police officer may not rely on good faith and inarticulate hunches to meet the *Terry* standard of reasonable suspicion." *Jones*[, 70 Ohio App.3d] at 557.

*Jones*, 2010-Ohio-2854, at ¶ 16-17. But this statement of the law has been refined by more specific caselaw touching on the question of when a 911 caller's tip to police can provide the police with reasonable suspicion.

{¶ 14} In *Florida v. J.L.*, the United States Supreme Court reviewed an appeal of a case where an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. 529 U.S. 266, 268 (2000). When the police went to that bus stop, they found three black males, only one of whom, J.L., was wearing a plaid shirt. *Id.* They stopped and frisked J.L. with the result that they seized a gun from his pocket. *Id.* Although the high court recognized that the tip was corroborated insofar as it accurately described the person the tipster meant to accuse, it did not provide any indicia of its reliability that J.L. was doing something illegal. *Id.* at 272. While the anonymous tip had accurately indicated J.L.'s location, as a matter of law, because the tipster was anonymous and did not provide sufficient other indicia of reliability to justify the belief that the tipster would have known private information about J.L. (like that he was clandestinely carrying a gun), the information did not rise to the level of reasonable suspicion such that J.L. was armed and dangerous sufficient to justify the stop and frisk. *Id.* at 270-74.

{¶ 15} In *Alabama v. White*, an anonymous caller reported to the police that a woman named Vanessa White would be leaving 235-C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with a broken right taillight, that she would be going to a particular motel, and that she would be in possession of about one ounce of cocaine inside a brown attaché case. 496 U.S. 325, 327 (1990). The police then observed a woman leave that location at or about the predicted time, enter a Plymouth station wagon with a broken right taillight, and drive on a direct route to the specified motel. *Id.* at 327, 331. When they stopped the car just short of the motel, they obtained consent to search and found a brown attaché case in the car. *Id.* at 327. Inside the case they found marijuana and not cocaine. *Id.* The cocaine the tipster referred to was recovered from a search of White's purse. *Id.* The Supreme Court considered the matter a "close case," because an informant's "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband." *Id.* at 332; *J.L.* at 271 (characterizing *White*). Yet, the Court found that the ability of the tipster to predict White's future activities as to where she was, when she would leave, and what her destination would be, sufficiently demonstrated that the tipster was both honest and well-informed enough about White to justify the stop. *White* at 331-32.

{¶ 16} In another more recent case, the Supreme Court considered a case where police stopped the driver of a truck on suspicion of drunk driving after another motorist called police to report that the truck (identified by make, model, color, and plate number) had run her off the road. *Navarette v. California*, 572 U.S. 393, 395, 399 (2014). The Court observed that the development of data systems related to 911 services had rendered it much harder to call 911 anonymously and accordingly observed that 911 callers are commensurately more likely to "think twice" before making a false report to 911. *Id.* at 400-01. It also noted that the caller in the case had identified herself (though some courts in the history of the case had treated her as an anonymous caller) and had observed firsthand the truck that had run her off the road. *Id.* at 398, fn. 1, 399-400. Yet, the Court still pointed out that:

> Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S., at 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889

(1968). We must therefore determine whether the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of past recklessness. *See Cortez*, 449 U. S. at 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981) ("An investigatory stop must be justified by some *objective manifestation* that the person stopped is, or is about to be, engaged in criminal activity").

(Emphasis added.) *Navarette* at 401. Ultimately, given the police's ability to ascertain the 911 caller's identity, the fact that the call was essentially an excited utterance from one with personal knowledge, and that swerving and running other cars off the road is a classic indicator of impairment, the Court concluded that the stop was justified by the caller's report. *Id.* at 400-03.

{¶ 17} The case before us combines elements of all three of these leading United States Supreme Court cases. Strongly in favor of the reliability of the tip was the fact that the caller in this case used the 911 system and was identified by first name and telephone number through that system such that she would have reasonably feared consequences if she made a false report. (State's Ex. B1.) That reliability is challenged, however, by the fact there is no evidence that the caller was previously known to the police to be reliable and the fact that, by her own admission, she did not have personal knowledge that the man in a maroon jogging suit had a gun—rather, her daughter told her. *Id.*

{¶ 18} In addition, the analysis prescribed by the Supreme Court indicates that we must consider whether the caller's tip created reasonable suspicion that criminal activity may have been afoot. *Navarette* at 401, quoting *Terry* at 30. The 911 caller in this case (as relayed to the arresting officers by dispatch) alleged that a black male in a maroon jogging suit near a blue Honda had a gun and was "trying to harm the caller." (State's Ex. B1.) While it is not illegal to merely possess a gun,[4] it is illegal to carry it in a concealed manner without a permit,[5] and it is certainly illegal to attempt to physically harm another person. R.C. 2903.13(A); R.C. 2903.11(A)(2). But the record does not contain any specificity about what harm was attempted, how it was attempted, or how the caller knew about it.

---

[4] R.C. 2923.11 *et seq.*; *see also McDonald v. Chicago*, 561 U.S. 742 (2010) (incorporating an individual right to bear arms); *Messerschmidt v. Millender*, 565 U.S. 535, 568 (2012) (Sotomayor & Ginsberg, JJ., dissenting) (noting that, as it is not a crime to possess a gun, it cannot, standing alone, form the criminal predicate for a search).
[5] R.C. 2923.12(A).

{¶ 19} This case involves a close question. Based on the caller being identified in this case, we assume, arguendo, that the caller's tip was a sufficient basis for developing reasonable suspicion to briefly detain a person matching the description given by the caller and investigate the situation. But thereafter, there is a problem with how the police applied the information given to them by the caller. Reasonable suspicion is sometimes called "particularized" or "individualized" because it must be directed toward a particular individual in order to be legally effective. *Navarette* at 396, citing *Cortez* at 417-18; *Terry* at 1, 21-22. For this precise reason, the United States Supreme Court has held, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), citing *Brown v. Texas*, 443 U.S. 47 (1979).[6] The officers noted as they approached that they did not see an individual in a maroon jogging suit.

{¶ 20} The contours of the tip were misapplied in Walton's case. The tip may have provided reasonable suspicion to stop and frisk an individual black male, wearing a maroon jogging suit and standing near a blue Honda at 1034 South Kellner Avenue. In this case, however, the police detained two black males and one black woman, clustered in and around a silver Honda eating chicken wings, none of whom was wearing a maroon jogging suit or anything that could reasonably have been mistaken for such. (State's Ex. C, Ellsesser Body Camera at 1:46-5:07.) Walton, in particular, was wearing a gray sweatshirt and jeans at the time the officers confronted him. *Id.*

{¶ 21} We defer to and agree with the trial court's factual findings that though Walton was not wearing a maroon jogging suit, Walton was (1) in the area of 1034 South Kellner Avenue, (2) near the time of the 911 call, (3) male, (4) black, and (5) near a blue Honda. (Mar. 5, 2019 Decision & Entry at 5.) However, three of those distinguishing characteristics are connected. That is, anyone in the area of 1034 South Kellner Avenue near the time of the 911 call would also have been near a blue Honda because the blue Honda was near 1034 South Kellner Avenue at that time. And many people in a metropolitan area such as Columbus are male and black (including another person

---

[6] It has also stated, "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334, fn. 2 (1990).

standing right next to Walton at the time of his detention, search, and arrest).  There were also other black men visible in other parts of the video evidence who were also near 1034 South Kellner Avenue at the time and, therefore, also relatively near both Hondas.  (State's Ex. C, Ellsesser Body Camera at 5:08-5:11, 5:39-5:49.)  The only part of the caller's description that distinguished any *individual* from the number of black men who were or might have been in the area of 1034 South Kellner Avenue near the time of the call would have been a maroon jogging suit—but none of the men was wearing one.  Further, Walton did not flee at the sight of the police or make other furtive movements to create suspicion until *after* he was detained.  *Cf. Wardlow* at 124-25.[7]

{¶ 22} Under these circumstances, detaining Walton violated the Fourth Amendment to the U.S. Constitution.  Because the subsequent observations about his pocket, the pat-down, and the search were all obtained by exploiting the illegal detention, the evidence obtained (in this case, the gun) should have been suppressed.  *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  We sustain Walton's sole assignment of error.

{¶ 23} The State also argues that a broad "good faith exception" to the exclusionary rule should apply and that we should weigh the deterrent effect of our ruling against the injury to society caused by suppressing the gun in this case.  (State's Brief at 25-27.)  We have previously addressed and rejected this argument on several occasions pointing out that "good faith" exceptions in this context have only been made in cases where officers relied on the judgment of an outside source (which later turned out to be erroneous).  *See, e.g.*, *State v. Thomas*, 10th Dist. No. 16AP-852, 2018-Ohio-758, ¶ 32-33; *State v. Dickman*, 10th Dist. No. 14AP-597, 2015-Ohio-1915, ¶ 21-28; *State v. Thomas*, 10th Dist. No. 14AP-185, 2015-Ohio-1778, ¶ 46; *State v. Forrest*, 10th Dist. No. 11AP-291, 2011-Ohio-6234, ¶ 17-18.  The United States Supreme Court stated, " 'good faith on the part of the arresting officers is not enough.'  If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Beck v. Ohio*, 379 U.S. 89, 97 (1964), quoting *Henry v. United States*, 361 U.S. 98, 102 (1959); Fourth Amendment. The State finally cites *State v. Lindway*, 131 Ohio St. 166 (1936), for the proposition that

---

[7] We also note that the caller did not say that the man in question was eating from a container on the back of the car (which would have been an obvious distinguishing detail to add) or that he was not by himself.

the Ohio Constitution contains no exclusionary rule. (State's Brief at 26-27.)  We have more than once recognized that *Lindway* has been explicitly overruled with respect to violations of the U.S. Constitution and "by implication" also for violations of the Ohio Constitution. *See State v. Kosla*, 10th Dist. No. 13AP-514, 2014-Ohio-1381, ¶ 20; *see also Thomas*, 2018-Ohio-758, at ¶ 33-35.  We therefore decline to further address these arguments by the State an additional time in this decision.  We sustain Walton's sole assignment of error and reverse.

## IV.  CONCLUSION

{¶ 24} A 911 caller informed police that a man in a maroon jogging suit standing near a blue Honda near 1034 South Kellner Avenue and, according to her daughter, had a gun, and she believed he was trying to harm her.  The police responded and detained two men and one woman, none of whom were wearing anything resembling a maroon jogging suit, all clustered around a silver Honda eating chicken wings.  Even assuming the 911 caller's tip was a sufficient basis for reasonable suspicion to stop and frisk a black male in a maroon jogging suit in the area of 1034 South Kellner Avenue, that is not who the officer in this case stopped and frisked.  We sustain Walton's sole assignment of error and reverse the judgment of the Franklin County Court of Common Pleas.

*Judgment reversed.*

KLATT and LUPER SCHUSTER, JJ., concur.