OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Deborah J. Barrett, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

The State of Ohio, Appellant, v. Carter et al., Appellees.
[Cite as State v. Carter (1994),     Ohio St.3d    .]
Constitutional law -- Search and seizure -- Evidence gained
    from the serach of an automobile and a residence
    suppressed, when.
    (No. 93-451 -- Submitted February 22, 1994 -- Decided
April 20, 1994.)
    Appeal from the Court of Appeals for Montgomery County, No. 13628.

    Mathias H. Heck, Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram, Assistant Prosecuting Attorney, for appellant.
    John H. Rion & Associates and John H. Rion, for appellee Larry T. Carter, Jr.
    Gump & Associates and Dennis E. Gump, for appellee Christopher R. Ross.
    Michael Miller, Franklin County Prosecuting Attorney, and Joyce S. Anderson, Assistant Prosecuting Attorney, urging reversal for amicus curiae, Ohio Prosecuting Attorneys Association.
    Gold, Rotatori, Schwartz & Gibbons Co., L.P.A., and John S. Pyle, urging affirmance for amicus curiae, Ohio Association of Criminal Defense Lawyers.

    Per Curiam. The cause is before this court pursuant to the allowance of a motion for leave to appeal.
    We adopt the February 4, 1993 decision of the court of appeals, which decision is attached as an appendix to this entry, and affirm the decision of the court of appeals for the reasons stated therein.
                                        Judgment affirmed.
    Moyer, C.J., A.W. Sweeney, Douglas, Wright, Resnick, F.E. Sweeney and Pfeifer, JJ., concur.

                        APPENDIX

    Brogan, Judge.

The state of Ohio appeals, pursuant to R.C. 2945.67(A) and Crim.R. 12(J), from a pretrial order of the Common Pleas Court of Montgomery County, Ohio, which suppressed evidence gained from the search of an automobile and a residence.

On March 3, 1992, appellees, Larry T. Carter and Chris R. Ross, were indicted by the Montgomery County Grand Jury upon two counts of aggravated trafficking in cocaine in violation of R.C. 2925.03(A)(9).  Pursuant to Crim.R. 12(J), the state has certified that the suppression order has rendered the state's proof so weak that any reasonable possibility of effective prosecution has been destroyed.

At the inception of the pretrial hearing the state stipulated that the defendants had legal standing to object to the search of the residence located at 2010 West Grand Avenue in Dayton, Ohio.

Ray McDonald testified that he loaned his 1987 Ford Bronco to Larry Carter on February 17, 1992 so Carter could move, and he assumed Ross was helping carter move, so he was permitted as a passenger in McDonald's vehicle.  McDonald said he placed no restrictions on how Carter used his Bronco.  He said he did not give Carter or Ross his Bronco "to haul cocaine in it."

Major Ronald Lowe testified he managed all uniform personnel for the Dayton Police Department and had eighteen years of experience as a police officer.

On February 19, 1992, at 10:15 a.m., Lowe testified he was in a unmarked cruiser travelling southbound on Philadelphia Drive approaching West Riverview when he noticed McDonald's white Bronco truck.  Lowe said he vaguely remembered that he had heard a police broadcast about one or two weeks previously concerning a Bronco being involved in a drive-by shooting on the west side of Dayton.  He said he remembered that the shooting allegedly took place twenty to twenty-five blocks from his present location.  He said he called the police dispatcher to obtain more details while he followed the Bronco to obtain its license number.  He said he also asked the dispatcher if there were other police crews in the area because he wanted to stop the Bronco, but the dispatcher did not reply.  He said shortly thereafter he lost sight of the Bronco.

A short time later Lowe said he spotted the Bronco parked behind a garage in an alley behind Grand Avenue.  Lowe said he did not initially see anyone in the Bronco and he took up a surveillance position and told the dispatcher of his approximate location.

Lowe said he then observed Larry Carter seated in the driver's seat and he noticed Chris Ross standing by the corner of a garage carrying some type of bundle in his arms.  Lowe said Ross switched the bundle from his left arm to his right arm.  Lowe said the bundle seemed heavy and was wrapped in something gray.  Lowe said he watched Ross get in the passenger seat of the Bronco and Carter then drove the Bronco down the alley and onto Everett.

Lowe then advised the dispatcher that he had relocated the Bronco and needed backup assistance.  He said he followed the Bronco and when he observed a uniformed cruiser he ordered that crew to make a "felony stop" on the car.  Lowe said a felony stop occurs when a vehicle is stopped and the subjects are ordered out of the vehicle at gunpoint.

Lowe said he ordered the felony stop of the Bronco because he did not know what was in the bundle that the passenger carried into the Bronco and he could not tell if it was a weapon.

Lowe said that Officers Christine Bean and Raymond Martin ordered Carter and Ross out of the Bronco at gunpoint. Lowe said he approached the Bronco and looked in the open passenger door for possible weapons. He said he noticed a bundle lying on the front floorboard and it appeared to be the bundle he saw Ross carrying into the Bronco. Lowe said he unwrapped the gray bundle and found a small package wrapped in brown opaque paper. Lowe said he thought the package might contain narcotics and so he secured the van and called for the evidence and narcotics units. Carter and Ross were then placed in separate police cruisers.

Lowe said the package was field tested and determined to be two pounds of cocain and he then ordered the police to secure the residence at 2010 West Grand Avenue until a search warrant could be obtained. The gray material Ross was carrying was determined to be gray pants or jeans.

Lowe admitted upon cross-examination that he did not observe Carter or Ross violate any law. Lowe made the following explanation:

"[THE WITNESS:] At that particular time, I didn't feel as a major and as a police officer that I needed to see him violate any statute in that he was in a high drug area.

"[MR. RION, attorney for defendants:] Objection, Your Honor. Move it be stricken.

"[MR. HECK, prosecuting attorney:] Let him finish, Judge. I wish you would instruct counsel to let him finish his answers.

"[MR. RION:] Your Honor, he is loading the record and --

"[MR. HECK:] He doesn't like what he was going to hear. Let's let justice come out.

"[THE COURT:] Continue your answer.

"[THE WITNESS:] The Bronco was in a high drug activity area. It was backed or pulled up against a garage in this high crime area. I felt, and I feel all our officers should feel, anything that suspicious, the vehicle will be stopped."

On cross-examination, Lowe admitted he had no information prior to February 19 concerning drug activity at 2010 West Grand Avenue. He admitted he had not seen Ross enter or leave any residence.

Lowe further explained his reason for ordering the felony stop of Carter and Ross:

"[THE WITNESS:] I see another subject walking between a fence and a garage out of a back yard with an arm of something in the middle of the daytime, which is very suspicious to me, and what I did, after he got in the car, I thought I had probable cause to stop it.

"[BY MR. RION:]

"Q. Didn't you just testify under oath, sir, that the broadcast gave no color about the type of Bronco that you had heard a week or two before?

"A. Sir, I just said I saw a Bronco sitting at the rear of 2010 West Grand Avenue that fit the description of the one I was just trying to check out. I wasn't going to stop the car

for the gun thing or whatever.  My intention was to get the license number on the Bronco, call in for backup in case some type of violation would have occurred so that this Bronco could have been stopped.

"Q.  Well, you clearly went beyond that when they arrested them with guns drawn, didn't you?

"A.  After I saw him come out of the back yard with something in his arms --

"Q.  With a handful of jeans.

"A.  It contained something else."

Lowe testified that he ordered the officers to conduct a felony stop on the car because he suspected that a breaking and entering had occurred, because he noticed a subject carrying a bundle from the rear of a residence with another subject in a van parked at the rear of the residence.  When asked what evidence he had to support his conclusions that a breaking and entering had occurred, Lowe answered:

"[Lowe:]  There was no evidence, counselor, of that happening.  That just happened to be a procedural type of thing."

Later that day Officer Chris Weber appeared before Dayton Municipal Court Judge Daniel Gehres in order to obtain a search warrant for 2010 West Grand Avenue in Dayton.  Weber's affidavit provided in pertinent part:

"On Wednesday, February 19, 1992, at approximately 10:30 a.m. Major Lowe observed a white Ford Bronco, License HB 2283 driving up Everette Dr.  Major Lowe recalled a broadcast last week by the dispatcher.  The dispatcher at the time advised a light colored Bronco was involved in shooting guns in the area of W. Third and James H. McGee.  Major Lowe called for a crew to stop the Bronco for F.I.C.'S in reference to the broadcast by the dispatcher.  Major Lowe lost the vehicle for a few seconds and then observed it stopped at the rear of 2010 W. Grand Ave.  Major Lowe observed the driver, later identified as Larry T. Carter seated in the truck.  Major Lowe observed the passenger, later identified as Chris R. Ross walking from the rear of 2010 W. Grand and go to the Bronco, indicating the driver was waiting for Ross to make a pick up or a delivery.  Major Lowe observed Ross carrying a pair of brown jeans bundled up as if to hide something.  Major Lowe noted that there was a six foot fence surrounding the back yard.  Det. Miller later checked and found that there is no gate in the front, the fence abuts the front of the house on both sides.  The fact that the yard was surrounded by a six foot fence made it unlikely that Ross could of [sic] been in any other house.  The Bronco pulled off and Major Lowe gave directions to the responding crews.

"The Bronco was stopped on Riverview at Philadelphia by uniform crews.  Uniform officers and Major Lowe approached the passenger side and Ross was ordered out of the vehicle to check for weapons.  Both subjects were patted down for officer safety.  Major Lowe checked the brown jeans (now on the floorboard) and found a package inside the jeans.  The package was approximately 6" by 6" and 2" thick, wrapped in tan tape.  Major Lowe believed the contents of the package to be drugs.  The driver advised he had the permission of the owner, Raymond McDonald to drive the vehicle.  Sgt. Weber later field tested the contents of the package and it tested positive for

cocaine. Carter refused to give permission to search the vehicle."

The municipal judge issued a search warrant for 2010 West Grand Avenue based on the preceding statement as well as additional information. Police officers recovered thirty pounds of cocaine and $146,550 as well as numerous guns in the search.

The defendants moved to suppress the evidence obtained from the search of the Bronco and of the residence. In a lengthy decision, the trial court found that Officer Lowe had failed to articulate facts which would raise a reasonable suspicion that either Carter or Ross had engaged in criminal activity which would justify their being stopped by police officers. Consequently, the trial court ordered that the cocaine which was found in the Bronco was to be suppressed. Additionally, the trial court found that the evidence seized at 2010 West Grand Avenue must be suppressed because the affidavit for the search warrant contained tainted evidence found as a result of the illegal stop. The court also found that the good-faith exception to the exclusionary rule as announced by the United States Supreme Court in United States v. Leon (1984), 468 U.S. 897, 104 S.Ct. 3430, 81 L.Ed.2d 677, had no application to the facts as presented to the court.

In its first assignment the state of Ohio contends that the trial court erred in finding that Carter and Ross possessed standing to challenge the search and seizure of the evidence found in the Bronco. The state contends that since the cocaine was found in a vehicle belonging to Ray McDonald, Carter and Ross lacked standing to object to the police officers' search of McDonald's Bronco.

In Jones v. United States (1960), 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, the United States Supreme Court held that automatic standing applied to any person charged with an offense in which possession is an essential element, and that any person legitimately on the premises where a search takes place could challenge the lawfulness of the search.

Automatic standing was eliminated in Rakas v. Illinois (1978), 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387. In Rakas, the defendants were passengers in an automobile that had been lawfully stopped on reasonable suspicion but unlawfully searched. The search uncovered a sawed-off rifle under the passenger seat and a box of shells in a locked glove box, which helped link the defendants to a robbery. The defendants never asserted a property interest in the evidence but claimed standing because of their lawful presence as passengers in the vehicle.

The issue before the court in Rakas was whether the Jones test conferring standing on one "who is lawfully on the premises" applied to automobiles. Justice Rehnquist noted that the inquiry requires a determination of whether the disputed search and seizure have infringed on an interest of the defendant which the Fourth Amendment was designed to protect. Justice Rehnquist contended the phrase "lawfully on the premises" created too broad a gauge for measurement of Fourth Amendment rights.

The court noted that the defendants asserted neither a property nor a possessory interest in the automobile, nor an

interest in the property seized, nor did they have a "legitimate expectation of privacy" in the glove compartment or the area under the seat of the car in which they were merely passengers.

The concurring opinion recognizes, as does the dissent, that the Fourth Amendment also protects the security of the person and this aspect of the amendment was not in issue in Rakas because the defendants "do not challenge the constitutionality of the police action in stopping the automobile in which they were riding; nor do they complain of being made to get out of the vehicle." Rakas, 439 U.S. at 150-151, 99 S.Ct. at 434, 58 L.Ed.2d at 406 (Powell, J., concurring). So the question before the Rakas court was a narrow one: Did the search of their friends' automobile after they left it violate any Fourth Amendment right of the petitioners? Two thirds of the United States Supreme Court (the two concurring justices and the four dissenters) recognized that a passenger does have standing to object to police conduct which intrudes upon his Fourth Amendment protection against seizure of his person. If either the stopping of the car or the passenger's removal from it is unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit. LeFave, Search and Seizure (1987) 323-327; United State v. Williams (C.A.5, 1979), 589 F.2d 210; People v. Bradi (1982), 107 Ill. App.3d 594, 437 N.E.2d 1285; State v. Epperson (1985), 237 Kan. 707, 703 P.2d 761; State v. Carter (1985), 28 Ohio App.3d 61, 28 OBR 101, 501 N.E.2d 1219.

Both passengers and the driver have standing regarding the legality of a stopping because when the vehicle is stopped, they are equally seized, and their freedom of movement is equally affected. State v. Eis (Iowa 1984), 348 N.W.2d 224; State v. DeMasi, (R.I. 1980), 419 A.2d 285, vacated on other grounds (1981), 452 U.S. 943, 101 S.Ct. 3072, 69 L.Ed.2d 948. Additionally, the driver of an automobile who demonstrates that he has the owner's permission to use the vehicle has a reasonable expectation of privacy in the vehicle and standing to challenge its stop and search. United States v. Rubio-Rivera (C.A.10, 1990), 917 F.2d 1271, 1275. The appellant's first assignment is overruled.

In its second assignment the state contends that the trial court erred in finding that the officer's observations of Carter and Ross and their vehicle and the reasonable inferences from these observations did not warrant an investigatory stop under Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ***.' This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." Terry, supra, at 8-9, 88 S.Ct. at 1873, 20 L.Ed.2d at 898.

In Terry, the United States Supreme Court addressed for the first time the constitutionality of the practice of police

officers stopping and frisking suspicious persons.

In that case the state of Ohio argued that in dealing with the rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess. The state argued that the police should be allowed to stop a person and detain him briefly for questioning upon suspicion he may be connected with criminal activity.

The United States Supreme Court in Terry rejected the notion that the police conduct involved in a stop and frisk was outside the purview of the Fourth Amendment because neither action rises to the level of a search or a seizure. The court emphatically rejected that notion and held that whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person. The court also noted that a frisk is not a petty indignity but a serious intrusion upon the sanctity of the person.

In Terry, the court held that where an officer observes unusual conduct which leads him to conclude in light of his experience that criminal activity may be afoot and that the persons which whom he is dealing may be armed and dangerous, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Chief Justice Warren further elaborated:

"*** And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? Cf. Carroll v. Unites States 267 U.S. 132 [45 S.Ct. 280, 69 L.Ed. 543], (1925); Beck v. Ohio, 379 U.S. 89, 96-97 [85 S.Ct. 223, 229, 13 L.Ed.2d 142], (1964). Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. See, e.g., Beck v. Ohio, supra; Rios v. United States, 364 U.S. 253 [80 S.Ct. 1431, 4 L.Ed.2d 1688] (1960); Henry v. United States, 361 U.S. 98 [80 S.Ct. 168, 4 L.Ed.2d 134] (1959). And simple '"good faith on the part of the arresting officer is not enough." *** If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers and effects," only in the discretion of the police.' Beck v. Ohio, supra, at 97 [85 S.Ct. at 229, 13 L.Ed.2d 148]." (Emphasis added; footnotes

omitted.)  Terry, supra, at 21-22, 392 U.S. at 1880, 20 L.Ed.2d at 906.

The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances.  State v. Freeman (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044.  Furthermore, these circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.  A court reviewing the officer's actions must give due weight to his training and view the evidence as it would be understood by those in law enforcement.  United States v. Cortez (1981), 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621; State v. Andrews (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271.

Although the investigative stop took place in a high crime area, that factor alone is not sufficient to justify an investigative stop.  Brown v. Texas (1979), 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357, 362-363 (being "in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct").  To hold otherwise would result in the wholesale loss of the personal liberty of those with the misfortune of living in high crime areas.

Major Lowe's articulated reason for ordering Officers Bean and Martin to engage in a felony stop of the Bronco was that he suspected that Carter and Ross were involved in a breaking and entering.  When asked to justify that conclusion Lowe responded:  "There was no evidence, counselor, of that happening.  That just happened to be a procedural type of thing."

The trial court appropriately found that the facts available to Major Lowe at the moment of the seizure of Carter and Ross would not warrant a man of reasonable caution in the belief that the action taken by him was appropriate.

Lowe stated the evidence that supported his suspicion that a breaking and entering had occurred was "the bundle, time of day and area of the occurrence."  Lowe observed Ross apparently leave a residence at 11:00 a.m. in the morning carrying a bundle and enter a vehicle and drive away with a waiting companion.  There was no evidence of a reported burglary.  Ross was not observed running away from the residence. He entered a vehicle which proceeded in a normal fashion from the residence.  Lowe knew nothing about Carter or Ross at that time.  In short, Major Lowe was unable to point to specific articulable facts that would lead a reasonable person to believe a breaking and entering had been committed by Carter and Ross.  An officer's inarticulate hunch will not provide a sufficient basis for an investigative stop.  The appellant's second assignment is also overruled.

In its last assignment, the state contends that the trial court erred in suppressing the evidence seized from 2010 West Grand Avenue pursuant to a search warrant because the good-faith exception to the exclusionary rule applies to this search.

The state argues that even if the stop of the Bronco was unlawful, the evidence seized as a result of the search warrant for 2010 West Grand Avenue should not be suppressed because the officers executing that warrant relied in good faith on the

validity of the search warrant, citing United State v. Leon (1984), 468 U.S. 897, 104 S.Ct. 3405, 81 L.Ed.2d 677.

In Leon, supra, the United States Supreme Court held that the Fourth Amendment exclusionary rule should not be applied so as to bar the use, in the prosecution's case in chief, of evidence obtained by an officer's acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid.

The court in Leon held that the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. The court further held that even assuming that the exclusionary rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity. Also, a police officer's reliance on the magistrate's probable cause determination must be objectively reasonable.

In Leon, police officers provided the magistrate with extensive facts relating to an intensive narcotics investigation. The police officer's application was even reviewed by a deputy district attorney. A facially valid search warrant was issued by a magistrate, but the trial court judge granted the defendant's motion to suppress, finding that the affidavit lacked sufficient probable cause. A divided court of appeals affirmed the trial court's determination. Under these circumstances, Justice White concluded in Leon that the officer's reliance on the magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion was inappropriate.

The trial court in the present case found that the exclusionary rule reaches not only primary evidence obtained as a result of an unlawful search or seizure, but also the derivative evidence which is the indirect product of unlawful police conduct, citing Segura v. United States (1984), 468 U.S. 796, 104 S.Ct. 3380, 81 L.Ed.2d 599. The court found that without the tainted evidence, i.e., the cocaine found as a result of the illegal stop of the Bronco, the search warrant would not have been obtained for the residential search.

The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality, or "fruit of the poisonous tree." Nardone v. United States (1939), 308 U.S. 388, 60 S.Ct. 266, 84 L.Ed. 307. The reason for the rule is the concern that if derivative evidence were not suppressed, police would have an incentive to violate constitutional rights in order to secure admissible derivative evidence even though the primary evidence secured as a result of the constitutional violation would be inadmissible. See Katz, Ohio Arrest, Search and Seizure (3 Ed. 1992), Section 2.07. Justice Frankfurter explained in Nardone, "To forbid the direct use of methods thus characterized but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.'" Nardone, supra, at 340, 60 S.Ct. at 267, 84 L.Ed. at 311.

The exclusionary rule does not apply, however, if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint, as where the police have an independent source for discovery of the evidence. Silverthorne Lumber Co., Inc. v. United States (1920), 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319.

In Segura v. United States, police officers observed Segura sell cocaine to two individuals. These individuals were followed and arrested. The police were then instructed to secure Segura's apartment while a search warrant could be obtained for it. Later that day Segura was arrested and police entered his apartment without his permission. Later the search warrant was obtained and a search of the apartment revealed cocaine and drug transaction records.

The Supreme Court found beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and the seizure of the cocaine and drug records. The court held that the information on which the warrant was secured came from sources wholly unconnected with the initial entry into the apartment and was known to the agents well before the entry. The court thus held the exclusion of the evidence was not warranted as "fruit of the poisonous tree."

Segura and Leon were decided by the United States Supreme Court on the same day. Although Leon does not directly confront the issue of whether evidence should be suppressed when the only information in the affidavit for the search warrant that could have provided probable cause was illegally obtained, the decision in Segura implies that such an unpurged illegality irreparably taints the search warrant when evidence is illegally obtained, and thus the specific deterrance rationale upheld by Leon dictates that suppression be granted.

In Murray v. United States (1988), 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472, the United States Supreme Court held that evidence observed by police during an illegal entry need not be excluded if the evidence is later discovered during the execution of a valid search warrant issued on information wholly unconnected to the prior entry. The court said the government must establish that (1) no information presented in the affidavit for the warrant was seen during the initial entry, and (2) the agents' decision to seek the warrant was not prompted by what they had seen during the initial entry.

The good-faith exception does not apply where a search warrant is issued on the basis of evidence obtained as a result of an illegal search. United States v. Vasey (C.A.9, 1987), 834 F.2d 782; United States v. Wanless (C.A.9, 1989), 882 F.2d 1459; United States v. Scales (C.A.10, 1990), 903 F.2d 765.

It is important to note that the Supreme Court in Leon was willing to provide a good-faith exception to the exclusionary rule where the police officer heeds the command of the Fourth Amendment and seeks the approval of a detached magistrate before conducting a search. In Leon, the police officers had not violated the Fourth Amendment in attempting to acquire the needed probable cause necessary for the proper issuance of the search warrant. See United States v. Broadhurst (D.C. Cal. 1985), 612 F.Supp. 777.

We agree with the trial court that the municipal court

judge would not have issued the search warrant for 2010 West Grand Avenue had he not been provided the evidence of the cocaine found in the Bronco as a result of a violation of the Fourth Amendment rights of Carter and Ross. Accordingly, evidence gained in the execution of the search warrant of 2010 West Grand Avenue must likewise be suppressed. The third assignment of error is accordingly overruled.

In 1914 the United States Supreme Court adopted the exclusionary rule in Weeks v. United States (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, holding that evidence obtained in violation of an accused's Fourth Amendment rights could not be used in a federal criminal prosecution against him. The Supreme Court refused to sanction in federal courts "a manifest neglect if not an open defiance of the prohibitions of the Constitution." Id. at 394, 34 S.Ct. at 656, 58 L.Ed. at 345. The court noted that while efforts to bring the guilty to punishment are praiseworthy, those efforts "are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." Id. at 393, 34 S.Ct. at 656, 58 L.Ed. at 344.

It was not until 1961 that the Supreme Court extended the exclusionary rule for Fourth Amendment violations to state criminal proceedings. Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. The court said that failure to apply the exclusionary rule would make the right of privacy meaningless and amounted to a withholding of its privilege and enjoyment. Justice Clark wrote in Mapp at 660, 81 S.Ct. at 1694, 6 L.Ed.2d at 1093:

"The ignoble shortcut to conviction left open to the State tends to destroy the entire system of constitutional restraints on which the liberties of the people rest. Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice."

One commentator has noted:

"The critics [of the exclusionary rule] forget that neither the rule nor the fourth amendment exists to protect the criminal in whose case the rule is applied. Both exist to protect society -- all those citizens who never break laws more serious than those prohibiting overtime parking. *** Narrowly viewed, the exclusionary rule is very unattractive, because in the vast majority of cases in which it is applied the immediate result is to free an obviously guilty person. But the guilty defendant is freed to protect the rest of us from unlawful

police invasions of our security and to maintain the integrity of our institutions.  Thus to suggest that the exclusionary rule fails to aid the innocent or that society rather than the policeman suffers for the policeman's transgression is nonsense.  The innocent and society are the principal beneficiaries of the exclusionary rule."  Dworkin, Fact Style Adjudication and the Fourth Amendment:  The Limits of Lawyering (1973), 48 Ind. L.J. 329, 330-331.

The judgment of the trial court is affirmed.

Judgment affirmed.

Grady, P.J., and Wolff, J., concur.