[Cite as *State v. Mosby*, 2021-Ohio-2255.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                         Court of Appeals No. L-20-1010

　　　Appellee                                     Trial Court No.  CR0201902483

v.

Timothy N. Mosby, Jr.                          **DECISION AND JUDGMENT**

　　　Appellant                                    Decided:  June 30, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**ZMUDA, P.J.**

## I.  Introduction

{¶ 1} Appellant, Timothy Mosby, appeals the judgment of the Lucas County Court
of Common Pleas, sentencing him to 42 months in prison after he pled no contest to
carrying a concealed weapon, receiving stolen property, having weapons under disability,

resisting arrest, and obstructing official business. Because we find that appellant's motion to suppress should have been granted, we reverse the trial court's judgment and remand this matter to the trial court.

## A. Facts and Procedural Background

{¶ 2} During the early morning hours of August 16, 2019, law enforcement officers began searching a crowd of people that were congregated in a parking lot at the Greenbelt Apartments in Toledo. Appellant, who was seated in the rear of a parked vehicle in that lot, was ordered to exit the vehicle. During the encounter, appellant was found to be in possession of a firearm. Consequently, on August 23, 2019, appellant was indicted on one count of carrying a concealed weapon in violation of R.C. 2923.12(A)(2) and (F)(1), a felony of the fourth degree, one count of receiving stolen property in violation of R.C. 2913.51(A) and (C), a felony of the fourth degree to which a firearm specification was attached, one count of having weapons while under disability in violation of R.C. 2923.13(A)(2) and (B), a felony of the third degree, one count of resisting arrest in violation of R.C. 2921.33(A) and (D), a misdemeanor of the second degree, and one count of obstructing official business in violation of R.C. 2921.31(A) and (B), a misdemeanor of the second degree.

{¶ 3} On September 24, 2019, after entering a plea of not guilty to the aforementioned charges, appellant filed a motion to suppress, in which he argued that his August 16 detainment was unconstitutional under both the Constitution of the United States as well as the Ohio Constitution, because the initial stop of the vehicle was not

2.

supported by reasonable, articulable suspicion. In its memorandum in opposition to the motion to suppress, the state argued that the stop was permissible under the totality of the circumstances, pointing to the timing of the stop (around 2 a.m.), the high crime location of the stop (a parking lot to which officers had previously responded for weapons-related offenses), and the fact that appellant was a participant in "a large disorderly disturbance."

{¶ 4} A hearing on appellant's motion to suppress was held on November 26, 2019. At the hearing, the state called four witness. Its first witness was sergeant Melvin Stachura of the Toledo Police Department's gang task force.

{¶ 5} Stachura testified that he was on duty on the morning of August 16, 2019, and participated in detaining appellant at a parking lot located adjacent to an apartment complex known as the Greenbelt Place Apartments. According to Stachura, the parking lot at which the stop was initiated is known as the Wayne Lot, so named after a deceased Cherrywood Crip gang member who was murdered there in early 2018. Stachura explained that the Greenbelt Place Apartments are also known as the Cherrywood apartments, which is a reference to the Cherrywood Crips who occupied the territory surrounding the apartment complex. Stachura testified that the Cherrywood apartment complex is a high crime area in the city of Toledo.

{¶ 6} As he continued, Stachura indicated that the Cherrywood Crips had an ongoing feud with the Gear Gang Crips in Toledo, which led to frequent police calls to the area around the Greenbelt Place apartments. According to Stachura, police "were in that area every night" in response to reports of disorderly conduct, open containers,

3.

drinking, drug use, loitering, and shots fired. These encounters, according to Stachura, led to the confiscation of "a lot of weapons."

{¶ 7} Stachura patrolled the area around the Wayne Lot earlier in his shift on August, 16, 2019, taking note of the large crowd that had gathered there. Upon his return to the Wayne Lot at 2 a.m., Stachura observed that there were "at least 25 people" in the parking lot. He testified that he observed "open alcohol consumption" and detected the odor of burnt marijuana in the area. He further explained that the individuals in the parking lot were "hanging out," which he determined met the definition of loitering. Stachura explained that loitering was a "huge problem" at the Wayne Lot, where Stachura frequently encountered "from 20 all the way up to a hundred people * * *, and there would be several fights that would break out."

{¶ 8} Before engaging the crowd at the Wayne Lot, additional police units were requested. Stachura explained that the request for additional units was made out of concern for officer safety based upon prior incidents of violence and the prevalence of weapons confiscations in that area. Moreover, Stachura stated that the decision to engage in the crowd was made by law enforcement and was not the product of any citizen complaints of criminal activity occurring at that location.

{¶ 9} When he arrived on the scene, Stachura noticed that there were "two or three cars" parked with the engines not running, around which there were individuals who were drinking alcohol. He stated that "at that point we were going to make a stop on everybody." He proceeded to the vehicle where appellant was seated as a rear passenger,

4.

and "asked all the occupants of that vehicle to please exit their vehicle." He stated at the suppression hearing that he ordered the occupants out of the vehicle for officer safety in light of the "type of activities that go on in that area," which he again identified as "several instances of weapons and shootings even with police on scene." He further elaborated that he wanted to detain everyone at the scene so that he could "find out who is actually doing the open consumption of alcohol, all the other various criminal activity that's going on at that moment." Moreover, Stachura indicated that he wanted to check everyone's identification so that he could ascertain who belonged at the apartment complex and who was loitering.

{¶ 10} Appellant initially ignored the command to exit the vehicle. Eventually, appellant was removed from the vehicle by police, at which point Stachura overheard other officers stating that they saw a firearm. Thereafter, officers removed appellant from the vehicle, confiscated a firearm from his waistband, and arrested him.

{¶ 11} On cross-examination, Stachura was pressed on his claim that the individuals, including appellant, were loitering at the Wayne Lot. He acknowledged that one of the passengers in the vehicle was a resident of the apartment complex, and was thus permitted to be there at the time. He also admitted that the vehicle was not impeding access to the parking lot or denying anyone passage.

{¶ 12} As to his observation of criminal activity, Stachura stated that the odor of burnt marijuana was not localized to the subject vehicle, and he acknowledged that the odor of burnt marijuana "can carry" over a distance depending on the wind and "several

5.

factors." Stachura testified that he did not see appellant or any of the occupants of the vehicle drinking alcohol, using marijuana, or engaging in any specific criminal activity. Nonetheless, Stachura indicated that he stopped the vehicle "because there [were] several individuals around it drinking and smoking marijuana."

{¶ 13} As its second witness at the suppression hearing, the state called Benjamin Kiser. Kiser is a police officer for the Toledo Police Department, assigned to the Special Operations Bureau. Like Stachura, Kiser indicated that the Wayne Lot is located in an area of heavy drug gang activity, and he noted that he spent "most of July responding to numerous shots fired calls."

{¶ 14} Kiser was dispatched to the Wayne Lot on August 16, 2019, in order to provide "overwatch for officer safety." Upon his arrival, Kiser observed individuals openly consuming alcohol and he detected an odor of burnt marijuana. Kiser noticed that officers who were already on the scene were detaining individuals, but he focused his attention on the vehicle in which appellant was seated because he noticed that "most of the individuals were hanging around" the vehicle. As he approached the vehicle, Kiser heard officers directing the occupants to exit the vehicle. He then ordered appellant to exit the vehicle, and appellant "essentially ignored [him], was moving around in the back seat of the vehicle." Kiser again instructed him to exit the vehicle, and appellant indicated that he was trying to do so. When appellant ignored Kiser's commands to exit the vehicle, Kiser became concerned that appellant was attempting to conceal a weapon or drugs. Thereafter, Kiser grabbed appellant's left arm and pulled appellant out of the

6.

vehicle. On cross-examination, Kiser acknowledged that he did not observe appellant consuming alcohol or using marijuana prior to appellant's arrest.

{¶ 15} As its third witness, the state called Toledo Police officer Michael Ellerbrock to the stand. Ellerbrock was one of the officers who responded to the Wayne Lot on the night of appellant's arrest. He generally corroborated the previous testimony concerning the open consumption of alcohol and the odor of burnt marijuana in the Wayne Lot, acknowledging that he did not observe appellant taking part in either of those activities. Ellerbrock testified that he was the officer who noticed the firearm in appellant's waistband as Kiser was pulling appellant out of the vehicle. Upon noticing the firearm, he grabbed appellant by the arm and removed the weapon from appellant's waistband. Ellerbrock's bodycam footage depicting his encounter with appellant was introduced into the record and published for the jury.

{¶ 16} For its fourth and final witness, the state called detective Nicholas Bocik of the Toledo Police Department's gang task force. Like the other witnesses, Bocik was present at the Wayne Lot on the morning of August 16, 2019. Bocik testified that Toledo police had responded to "over 20 reports involving firearms or shots fired or something of that type of incident" in the area around the Wayne Lot during the three months preceding appellant's arrest. Bocik characterized the Wayne Lot as a high crime area, and proceeded to recount several specific incidents of shots fired and other violent crimes involving firearms that took place near the Greenbelt Place Apartments between May

7.

2019 and August 2019. Notably, Bocik did not testify as to any reports of shots fired in connection with the August 16, 2019 Wayne Lot encounter.

{¶ 17} After the state finished presenting its witnesses, appellant elected not to call any witnesses, and the parties presented their closing arguments. For his part, appellant argued that the state failed to establish the existence of reasonable suspicion to support its investigative stop of the vehicle or appellant. Appellant highlighted the fact that the state's witnesses testified that they neither detected an odor of marijuana emanating from the vehicle nor observed any of the occupants of the vehicle consuming alcohol. Appellant further explained that the stop was not premised upon an ongoing emergency or a citizen complaint. Thus, appellant reasoned, the police should have simply issued citations to those who were openly consuming alcohol, and then order the crowd to disperse. Contending that reasonable suspicion was lacking here, appellant argued that the officers were not permitted to detain everyone who was present, including the occupants of the vehicle in which he was a passenger, which was legally parked in the Wayne Lot.

{¶ 18} During its closing argument, the state argued that the totality of the circumstances supported the notion that the officers had reasonable suspicion of criminal activity to initiate the stop of appellant and the others in the vehicle. First, the state relied upon the fact that the stop occurred in a high crime area, and referenced the testimony that the Wayne Lot is "one of the most dangerous places in the city of Toledo." Second, the state pointed to the fact that each of the officers who testified indicated that extensive

8.

criminal activity had occurred in and around the area of the Wayne Lot during the summer of 2019. Third, the state relied upon the time of day in which the stop took place as a factor weighing in favor of a finding that officer's had reasonable suspicion to justify the stop. Fourth, the state contended that the stop was justified based upon appellant's suspicious activity, namely his "repeated refusal to exit the vehicle when he was ordered to do so." Finally, the state cited the training and experience of the officers, who testified that had been involved in gang suppression for many years and were familiar with the area around the Wayne Lot and the Greenbelt Place Apartments.

{¶ 19} Upon hearing the arguments of the parties, the trial court rendered its decision on appellant's motion to suppress from the bench. The court found that the state established reasonable suspicion based upon the expertise of the officers, their knowledge of an ongoing gang war, their observation of open container violations and the odor of burnt marijuana, the high crime nature of the Wayne Lot area, and appellant's refusal to exit the vehicle upon command. In light of these factors, and upon finding that officer safety concerns justified the police in ordering appellant out of the vehicle, the trial court denied appellant's motion to suppress from the bench. The court issued a written decision summarily denying the motion to suppress on November 27, 2019.

{¶ 20} Thereafter, on December 5, 2019, appellant appeared before the trial court for a change of plea hearing, at which he entered a plea of no contest to the charges contained in the indictment. The trial court accepted appellant's plea, found him guilty of the charges, and continued the matter for sentencing.

9.

{¶ 21} At a December 23, 2019 sentencing hearing, the trial court ordered appellant to serve prison sentences of 12 months for carrying a concealed weapon, 12 months for receiving stolen property, 18 months for having weapons while under disability, 90 days for resisting arrest, and 90 days for obstructing official business. Additionally, the trial court imposed a sentence of one year for the firearm specification attached to the charge of receiving stolen property. Appellant was then ordered to serve the 12-month sentences and 90-day sentences concurrently to one another, but consecutively to the remaining 18-month sentence and one-year sentence, for an aggregate prison sentence of 42 months. Thereafter, appellant filed his timely notice of appeal.

### B. Assignment of Error

{¶ 22} On appeal, appellant assigns the following error for our review:

The Trial Court erred in denying Appellant's Motion to Suppress when the officer lacked a reasonable and articulable suspicion to justify the stop and detention of Appellant in violation of the Fourth and Fourteenth Amendments and Article I, Section 14 of the Ohio Constitution.

### II. Analysis

{¶ 23} In his sole assignment of error, appellant argues that the trial court erred in denying his motion to suppress.

{¶ 24} Our review of the trial court's denial of appellant's motion to suppress "presents a mixed question of law and fact." *State v. Wesson*, 137 Ohio St.3d 309, 2013-

10.

Ohio-4575, 999 N.E.2d 557, ¶ 40, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We must accept the trial court's factual findings if they are supported by competent credible evidence, and "independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Wesson* at ¶ 40, quoting *Burnside* at ¶ 8.

{¶ 25} Here, appellant argues that the trial court should have granted his motion to suppress, because the discovery of a firearm on his person was the product of an investigatory detention that was not supported by reasonable suspicion and was therefore unconstitutional under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution, both of which protect citizens from unreasonable searches and seizures.

{¶ 26} "'The U.S. Supreme Court has created three categories of police-citizen contact to identify the separate situations where constitutional guarantees are implicated: (1) consensual encounters, (2) investigative or "*Terry* [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]" stops, and (3) arrests.'" (Citations omitted.) *State v. Williams*, 6th Dist. Lucas No. L-17-1148, 2018-Ohio-5202, ¶ 20, quoting *State v. Staten*, 4th Dist. Athens No. 03CA1, 2003-Ohio-4592, ¶ 16. Here, the encounter between appellant and police falls into the category of an investigative *Terry* stop.

{¶ 27} In order to pass constitutional muster, an investigative stop must be premised upon an officer's reasonable, articulable suspicion of criminal activity. *Bowling Green v. Murray*, 6th Dist. Wood No. WD-18-045, 2019-Ohio-4285, ¶ 12, citing

11.

*State v. Mesley*, 134 Ohio App.3d 833, 840, 732 N.E.2d 477 (6th Dist.1999). Such suspicion must be objective, particularized, and based on the totality of the circumstances confronted by the officer prior to the stop. *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991); *see also United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.").

{¶ 28} In analyzing suppression arguments challenging the propriety of investigative stops, courts must view the totality of the circumstances "'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *State v. Freeman*, 64 Ohio St.2d 291, 295, 414 N.E.2d 1044 (1980), quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976). To be sure, an investigative stop cannot be "based on nothing more substantial than inarticulate hunches * * *." *Terry* at 22. Rather, "before stopping a person, the officers must have an objective basis for suspecting that *that* particular person was involved in the criminal activity. (Emphasis sic.) *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, ¶ 26 (Donnelly, J., concurring), citing *Cortez* at 417-418 and *Ybarra v. Illinois*, 444 U.S. 85, 94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). In determining whether or not the officer has a reasonable suspicion we look at the totality of the circumstances and not to any one factor. *Andrews* at 87.

12.

{¶ 29} The investigative stop at issue in this case took place upon officers' arrival at the Wayne Lot. Ellerbrock's bodycam footage of his encounter with appellant and testimony from the officers reveals that the vehicle in which appellant was a passenger was targeted for detention almost immediately upon officers' arrival on the scene, without any observation of criminal or even suspicious conduct on appellant's part.

{¶ 30} In its brief to this court (and in its arguments before the trial court at the suppression hearing), the state relies upon several factors that appear in the Ohio Supreme Court's decision in *Andrews*. The state claims that these factors provided officers with reasonable suspicion to conduct their investigative stop of the vehicle and its passengers (including appellant). The factors cited by the state include (1) the high crime area in which the Wayne Lot is located, (2) the time of day of the encounter (approximately 2 a.m.), (3) the training and experience of the detaining officers, who were long-time members of the gang task force unit, and (4) appellant's suspicious conduct after he was ordered to exit the vehicle.

{¶ 31} As noted, the factors relied upon the by the state were previously used to justify an investigative stop in the Ohio Supreme Court's decision in *Andrews*. *Id.* at ¶ 88; *see also State v. Williams*, 6th Dist. Lucas No. L-17-1148, 2018-Ohio-5202 (examining the foregoing factors in the context of a reasonable suspicion analysis). However, as set forth below, we find that one of the factors articulated by the Ohio Supreme Court in *Andrews* (suspicious activity of the defendant) is not supported by any

13.

evidence in this case, and the other factors do not give rise to a particularized suspicion that appellant was engaged in criminal activity.

{¶ 32} Initially, we reject the state's reliance upon appellant's allegedly suspicious activity after he was ordered to exit the vehicle. In *Andrews*, the suspicious activity occurred *prior to* the stop. Specifically, the officer observed the defendant running away from the police cruiser, and when the defendant saw the officer he suddenly stopped and threw down what he was carrying in his hand. *Id.*

{¶ 33} By contrast, appellant's activity occurred *after* the investigative stop was already underway. The investigative stop began, and appellant was detained, at the moment he was ordered out of the car. *State v. Johnson*, 8th Dist. Cuyahoga No. 92540, 2009-Ohio-5377, ¶ 22. Logically, appellant's conduct in responding to the officers' orders to exit the vehicle could not form the basis for the officers to approach the vehicle and initiate the stop in the first place. Unlike the defendant's prior conduct in *Andrews*, which could give rise to a reasonable suspicion of criminal activity, appellant's actions in response to the officers' commands, whether suspicious or not, are irrelevant to the question of whether the investigative stop in this case was supported by reasonable suspicion.

{¶ 34} Turning to the remaining factors, we agree with the state that the testimony provided at the suppression hearing established that the stop was initiated by experienced

officers, in a high crime area, late at night.[1]  However, these factors alone do not support the initiation of an investigative stop, because the officers who responded to the Wayne Lot did not possess the requisite reasonable suspicion to believe that *appellant* was engaged in criminal activity.  Indeed, there is a dirth of evidence in the record that appellant or any of the other passengers in the vehicle were suspected of any criminal activity.

{¶ 35} According to Stachura and the other officers, a large crowd of individuals were gathered at the Wayne Lot upon his arrival on the scene.  Some of these individuals were openly consuming alcohol, but appellant and the other occupants of the vehicle were not.  Further, there was an odor of burnt marijuana in the air, but none of the officers testified that it was emanating from the vehicle, and the officers acknowledged that they did not see the vehicle's occupants using marijuana.

{¶ 36} Rather than limit their encounter to the individuals who were engaged in criminal activity, Stachura decided to "make a stop on everybody" so that he could "find

---

[1] The dissent emphasizes the facts supporting these factors, and finds that we fail to tie these facts to the officer's treatment of appellant.  While we acknowledge that the area in which the stop in this case occurred was a high crime area, this fact does not eclipse the need for a *particularized* suspicion in order to justify a *Terry* stop.  Otherwise, officers patrolling in high crime areas would be given *carte blanche* to stop an individual simply because the individual is found in an area associated with crime.  This would encourage the arbitrary exercise of law enforcement power, and usher in something akin to "Fourth-Amendment-free zones" in certain locations.  We recognize that the high crime nature of an area is a *factor* to be considered in evaluating a stop under *Terry*, but we reject the state's attempt to make high crime, standing alone, a sufficient factor to support a *Terry* stop.

15.

out who is actually doing the open consumption of alcohol, all the other various criminal activity that's going on at that moment." Stachura indicated that he stopped the vehicle "because there [were] several individuals around it drinking and smoking marijuana."

{¶ 37} This testimony is revealing, because it demonstrates that officers lacked any particularized suspicion that the occupants of the vehicle (including appellant) were engaged in, or about to be engaged in, any criminal activity. In essence, the investigative stop at issue here was premised upon officers' knowledge of historical criminal activity in this high crime area, and observations of conduct of other individuals outside the vehicle, not any observations specific to appellant or the other occupants of the vehicle. Moreover, despite extensive testimony as to the prevalence of gang activity in this area generally, there was no evidence adduced by the state at the suppression hearing to suggest that gang activity was underway at the Wayne Lot at the time of appellant's detention, and officers did not testify that appellant or any of the occupants of the vehicle were engaged in gang activity.

{¶ 38} The record below establishes that (1) the Wayne Lot is a high crime area in the city of Toledo and (2) other individuals in the parking lot were engaged in illegal activity.[2] In *State v. Carter*, 69 Ohio St.3d 57, 630 N.E.2d 355 (1994), the Ohio Supreme

---

[2] At the suppression hearing, officers briefly asserted that the individuals at the Wayne Lot were loitering, without elaborating as to whether appellant's presence in the vehicle constituted a violation of the city of Toledo's loitering ordinance or any other loitering law. Moreover, the officers acknowledged that one of the occupants of the vehicle was a resident of the Greenbelt Place apartments and was therefore permitted to be at the parking lot. On this record, we find that loitering did not provide a basis for the

16.

Court examined the propriety of an investigative stop that took place in a high crime area, and stated "that factor alone is not sufficient to justify an investigative stop. * * * To hold otherwise would result in the wholesale loss of the personal liberty of those with the misfortune of living in high crime areas." *Id.* at 65; *see also Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (being "in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct"). Further, appellant's "mere proximity to others independently suspected of criminal activity does not, without more, provide a sufficient constitutional basis to [stop] that person." *State v. Rosa*, 8th Dist. Cuyahoga No. 85247, 2005-Ohio-3028, ¶ 14; *see also Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (examining the issue of particularity in the context of the search of a person, and stating that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").

---

investigative stop in this case. *See State v. Griffin*, 133 Ohio App.3d 490, 500, 728 N.E.2d 1097 (6th Dist.1999), quoting *Thornhill v. Alabama*, 310 U.S. 88, 97-98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) ("Subjectively interpreting the loitering laws to provide probable cause to arrest in order to search an individual in a high crime or drug area, where there was no probable cause to believe any drug offense had occurred, creates a convenient but impermissible tool for 'harsh and discriminatory enforcement by local prosecuting officials against particular groups deemed to merit their displeasure.'"); *Johnson*, *supra*, 8th Dist. Cuyahoga No. 92540, 2009-Ohio-5377, at ¶ 24 ("merely because [the defendant] was in a car parked in an area where several people were loitering on a sidewalk does not give the state justification to search [him] or the car he was occupying.").

17.

{¶ 39} While the officers may have had the requisite reasonable suspicion to initiate an investigative stop of the individuals outside the vehicle, they possessed nothing more than an "inchoate and unparticularized suspicion," or a "hunch" that appellant was engaged in criminal activity. *State v. Rivera*, 6th Dist. Lucas No. L-04-1369, 2006-Ohio-1867, ¶ 18, quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889. Because the officers failed to articulate an objectively reasonable basis to suspect that *appellant* was engaged in criminal activity, relying instead on the fact that appellant was sitting in a parked car in a high crime area, we hold that reasonable suspicion was lacking here.[3]

{¶ 40} Were we to hold otherwise, we would obliterate the particularization requirement set forth in *Terry* and its progeny, and establish an "unwise precedent that a police officer may conduct an investigative stop of any person present in a so-called 'high crime' area * * *, without any specific and articulable facts pointing more directly to that

---

[3] The dissent focuses on officer safety as a basis for the officers to order appellant out of the vehicle, concluding that the officers exercised reasonable and prudent precaution by clearing the vehicle while conducting the investigation of those individuals who were loitering at the Wayne Lot. We recognize the need for officers to ensure their own safety in carrying out legitimate police functions, but we reject the notion that such safety concerns trump the constitutional rights enjoyed by those individuals with whom police interact. Instead, safety precautions must be crafted by officers to *both* protect the officer and safeguard the individual's constitutional rights. In this case, the officers could have fulfilled this dual objective by, for example, simply ordering the driver of the vehicle in which appellant was a passenger to depart from the Wayne Lot, thereby removing the vehicle and its occupants from the area entirely. This would have been especially appropriate here, because the officers had no indication that the detected odor of marijuana was emanating from the vehicle at the time of the encounter and there were no other indicia of criminal activity specific to the occupants of the vehicle.

18.

particular person's being engaged in criminal activity." *Hairston*, *supra*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, at ¶ 32 (O'Connor, C.J., dissenting).

{¶ 41} Having found that officers lacked reasonable suspicion to initiate the investigative stop of appellant, it follows that the firearm discovered during the investigative stop should have been suppressed as "fruits of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The trial court erred in denying appellant's motion to suppress such evidence, and we therefore find appellant's sole assignment of error well-taken.

### III. Conclusion

{¶ 42} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas denying appellant's motion to suppress is reversed, and this matter is remanded to the trial court for further proceedings consistent with this decision. Pursuant to App.R. 24, appellee is hereby ordered to pay the costs incurred on appeal.

Judgment reversed,
and remanded.


Christine E. Mayle, J. _____

Gene A. Zmuda, P.J. _____
CONCUR.

_____
                JUDGE


_____
                JUDGE


Myron C. Duhart, J. _____
DISSENTS AND WRITES
SEPARATELY.

**DUHART, J.**

{¶ 43} I respectfully dissent from the majority's opinion reversing the trial court's denial of Mosby's motion to suppress. I conclude that the facts as articulated do not accurately reflect the reality of the situation with which officers were faced, and, therefore, led to a faulty analysis and result in this case.

{¶ 44} While the majority acknowledges that there was evidence of "over 20 reports involving firearms or shots fired" in the area around the Wayne Lot during the three month's preceding appellant's arrest, they seem to ignore specific evidence of a recent report, from August 10, 2019, of an incident during which some 40 people who had gathered in the Wayne Lot were fighting. They also fail to mention a report from August 15, 2019 -- the night before appellant's arrest in this matter -- of an incident during which a large group of individuals were loitering at the Wayne Lot and then fled, after which police recovered a firearm on the tire of a vehicle. As testified to by the officers, the Greenbelt Apartments/Wayne Lot area was a high crime area that officers responded to frequently in the summer of 2019.

{¶ 45} Although the majority acknowledges: (1) that the area in question was a high crime area, (2) that people gathered in the area with appellant -- at 2:00 a.m. -- were openly consuming alcohol, and (3) that there was the odor of burnt marijuana in the air, they largely fail to tie these facts to the officer's treatment of appellant. The scene of the arrest was not just a high crime area; it was a high crime area in which a crowd was gathered and where yet-to-be-identified individuals in that crowd were unquestionably

20.

involved in illegal activity. While the majority admits that "the officers may have had the requisite reasonable suspicion to initiate an investigative stop of [other unnamed or otherwise identified] individuals outside the vehicle," they puzzlingly conclude that the officers "possessed nothing more than an 'inchoate and unparticularized suspicion,' or a 'hunch' that appellant was engaged in criminal activity inside the car.

{¶ 46} When the majority states that "the investigative stop * * * was premised upon officers' knowledge of historical criminal activity in this high crime area, and observations of conduct of other individuals outside the vehicle, [and] not any observations specific to appellant or the other occupants of the vehicle," they erroneously isolate appellant, his behavior, and his treatment, on the night in question from highly relevant surrounding circumstances. The circumstances of this case involve more than appellant's "mere proximity" to others engaging in illegal activity. Because appellant was a part of the crowd in which as-yet-unidentified members were engaged in illegal activity, and because the crowd was located in an area where crowds were frequently and recently the source of violence and illegal firearms, officers had a reasonable basis to suspect that appellant, himself, was involved in criminal activity.

{¶ 47} Sgt. Stachura testified that when the 2:00 a.m. detention of appellant occurred, appellant was seated in the back seat of a vehicle that was surrounded by loitering individuals. He further testified that appellant was asked to exit the vehicle for officer safety, because it was difficult to see appellant's hands or any weapons he may have possessed. Given the circumstances, I believe that the officers' precaution in this

21.

regard was lawful, reasonable, and prudent. Officer Kiser testified that appellant refused to exit the vehicle and was "moving around" in the back seat, although nothing was impeding him from exiting and, instead, he was merely ignoring officer directions. Officer Kiser testified that he was concerned that appellant was concealing weapons or drugs, something that Officer Kiser had commonly experienced suspects doing. Officer Ellerbrock likewise testified that appellant refused to exit the vehicle, and Officer Ellerbrock subsequently observed the firearm in appellant's waistband.

{¶ 48} In sum, the chain of events that led to appellant being taken out of the car should be viewed in its totality, as a continuum of suspicion, where each circumstance reasonably increased the officers' level of suspicion. In so doing, I conclude that evidence of appellant's suspicious conduct as described by the officers clearly favors a finding of reasonable, articulable suspicion. Likewise, I believe the majority errs in limiting the focus of its analysis to the narrow question of whether criminal activity may or may not have been occurring inside the vehicle at the precise time that the officers approached, apparently giving little or no weight to the totality of the circumstances that brought appellant to the attention of the officers in the first place.

22.